109 F.3d 557
 97 Cal. Daily Op. Serv. 2006, 97 Daily Journal
D.A.R. 3697
David L. MAY, Plaintiff-Appellant,
v.
G.H. BALDWIN, Superintendent Eastern Oregon Correctional
Institution; Strogham, Hearings Officer at EOCI; Al
Chandler, Administrator, Oregon Department of Corrections
Classification and Transfer Division; M. Barth, Captain,
Oregon Department of Corrections Transportation Manager; J.
Ramsey, Lieutenant Oregon Department of Corrections
Transportation Program Assistant Manager, Defendants-Appellees.
 No. 95-35860.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1997.
Decided March 19, 1997.
 
 Cheryl O'Connor Murphy, Howrey & Simon, Los Angeles, California, for the Plaintiff-Appellant.
 Richard D. Wasserman, Assistant Attorney General, Salem, Oregon, for the Defendants-Appellees.
 Appeal from the United States District Court for the District of Oregon, Robert E. Jones, District Judge, Presiding. D.C. No. CV-94-00664-REJ.
 Before D.W. NELSON and TROTT, Circuit Judges, and BRYAN,* District Judge.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Oregon state prisoner David May appeals the entry of summary judgment for George Baldwin, the Superintendent at the Eastern Oregon Correctional Institution ("EOCI"), and other officials at EOCI (collectively, the "prison officials") in his 42 U.S.C. § 1983 action seeking damages and declaratory and injunctive relief. May contends that, under the standards mandated by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1 (1994), the prison officials violated his free exercise rights when they required him to unbraid his dreadlocks for a search. In addition, May cites further violations of his First, Fourth, Eighth, and Fourteenth Amendment rights. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the grant of summary judgment for the prison officials.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 May practices Rastafarianism, a Christianity-based religion that mandates certain lifestyle practices derived from the Bible. In accordance with the tenets of his religion, May wears his hair in the uncut, uncombed style known as dreadlocks. The prison officials neither contest the sincerity of May's religious beliefs nor dispute that maintaining dreadlocks forms a fundamental part of the exercise of Rastafarianism.
 
 
 3
 May was incarcerated at EOCI from March 1, 1994 until October 15, 1996, when he was transferred to Bannock County Jail in Pocatello, Idaho. May was returned to the Oregon Correctional System on March 3, 1997. Currently, he is incarcerated at the Snake River Correctional Institution in Ontario, Oregon. Oregon Department of Corrections administrative rules provide that "all inmates will be subject to a search on each occasion before and after they leave a Department of Corrections facility, and on each occasion before and/or after visits, entering or exiting the Disciplinary Segregation Unit and/or before or after contact with persons outside the facility." Or.Admin.R. 291-41-020(4) (1991). According to the regulations governing these searches, "[i]f a hair search needs to be conducted by staff, it may be necessary to require that the inmate unbraid or loosen the hair to complete the search." Or.Admin.R. 291-123-015(2)(b) (1993). The regulations also state that prison officials should use nonintrusive sensors to detect weapons or narcotics whenever appropriate in order to "avoid unnecessary force, embarrassment, or indignity to the inmate." Or.Admin.R. 291-41-010(8), 291-41-020(5) (1991).
 
 
 4
 In 1994, May was scheduled for a series of medical appointments involving removal of a vocal chord tumor and follow-up treatment after the surgery. The incidents giving rise to May's free exercise claim center on his reluctance to loosen his dreadlocks for searches before transport to medical facilities outside of EOCI.
 
 
 5
 On March 24, 1994, transport officers ordered May to unbraid his dreadlocks for a search, and he refused. The prison officials report that May stated he "could not take his dreadlocks out" because they "had been that way for four years." At the time, May did not explain that the dreadlocks had religious significance. The officials declined to transport May to his medical appointment, issued a misconduct report for violation of inmate rules, and placed him in the Disciplinary Segregation Unit ("DSU") pending a disciplinary hearing. May was later sanctioned to seven days in DSU and loss of privileges for 21 days after his release from DSU.
 
 
 6
 On May 17, 1994, May again refused to undo his dreadlocks for a search in preparation for transport. He had been given a day's notice of the requirement to undo his hair, but he refused to comply. He stated that he was "not going on no med trip, and if I am I'm not going to remove my braids." He also explained that "it would take a long time to remove" his braids. May did not, however, claim that religion motivated his resistance. After a disciplinary hearing, May was sanctioned to seven days in DSU, loss of recreation yard privileges while in DSU, loss of privileges for 14 days upon release from DSU, and a $25 fine.
 
 
 7
 On May 18, 1994, May informed the prison officials in writing that the Rastafarian religion required him to wear dreadlocks. May had not previously raised a religious objection to the regulation. However, prior to May 18, May had filed repeated requests not to be scheduled for any medical transports absent extreme urgency because the conflict over such transports "jeopardized his freedom."
 
 
 8
 On other occasions, May had complied with the command to loosen his dreadlocks. He unbraided his hair on March 28, 1994, when returning to DSU from a medical trip, on April 25, 1994, when brought to DSU after a disciplinary hearing, and on May 17, 1994, when placed in his cell in DSU. When he submitted to these hair searches upon entry to DSU, May already was under sanction for his initial refusal to undo his dreadlocks.
 
 
 9
 For their part, the prison officials have sometimes waived the requirement that May undo his dreadlocks before transport. On March 21, 1994, EOCI's superintendent directed guards to transport May without loosening his dreadlocks because May had an urgent medical condition. May claims that there were at least three other incidents when he was transported outside of EOCI without changing the style of his hair. Specifically, May points out that the prison officials did not require him to undo his dreadlocks before his transfer to Bannock County Jail.
 
 
 10
 In addition to his free exercise claim, May complains of several constitutional deficiencies in his treatment at EOCI. He alleges that the prison officials violated his First and Eighth Amendment rights when he lost the privilege of access to the general prison library. May also cites Fourth Amendment violations based on visual strip searches, raises due process concerns about his placement in DSU and an alleged mental health classification, and claims that he was discriminated against in the provision of medical care on the basis of race. Furthermore, May issues a wide-ranging Eighth Amendment challenge to the conditions of his confinement: He claims that he is denied the opportunity to exercise, that he does not have access to medical treatment, and that he is not provided with adequate food, water, or sanitation.
 
 
 11
 May filed suit against the prison officials on June 13, 1994, seeking both damages and equitable relief. On March 1, 1995, the prison officials moved for summary judgment. They argued that dreadlocks endanger prison security because they provide a hiding place for weapons, escape devices, or drugs that cannot be detected by means other than loosening the braids. The prison officials also asserted qualified immunity from liability for damages. On August 7, 1995, the district court granted the prison officials' motion for summary judgment on each of May's claims.
 
 
 12
 May originally brought this action as a pro se litigant; the Ninth Circuit appointed pro bono counsel for the purpose of pursuing the RFRA portions of his appeal.
 
 STANDARD OF REVIEW
 
 13
 We review the district court's grant of summary judgment de novo. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to May's claims, whether there are any genuine issues of fact and whether the district court correctly applied RFRA. Id. We do not endeavor to weigh the evidence; we need only determine whether there is a factual dispute that precludes summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1131 (9th Cir.1994). The district court's finding of qualified immunity is reviewed de novo as well. Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993).
 
 DISCUSSION
 
 14
 RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that application of the burden to the person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. The purpose of RFRA is "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1).
 
 
 15
 The strict scrutiny standard set forth in RFRA controls our analysis of whether the hair search procedure at EOCI violated May's free exercise rights. Congress debated and rejected an amendment that would have exempted prisons from RFRA's stringent test, and our earlier cases interpreting RFRA have made clear that the act governs the conduct of prison officials. See Stefanow v. McFadden, 103 F.3d 1466, 1471 (9th Cir.1996); Bryant v. Gomez, 46 F.3d 948, 949 & n. 1 (9th Cir.1995); S.Rep. No. 103-111, at 9-11 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1898-1901.
 
 I. Qualified Immunity
 
 16
 We first address the district court's determination that the prison officials have qualified immunity from liability for damages on May's free exercise claim. The affirmative defense of qualified immunity shields public officials performing discretionary functions from liability for civil damages under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A right is clearly established for purposes of qualified immunity if, at the time the right was allegedly violated, its contours were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). May bears the burden of demonstrating that his rights under RFRA were clearly established in 1994, and he has not carried that burden. See Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir.1993).
 
 
 17
 In 1994, at the time of the alleged constitutional violations, it was well established that prisoners retained the protections of the free exercise clause. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). It was not clear, however, that free exercise rights protected prisoners from intrusions such as the hair search procedure at issue here. Although RFRA installed the least restrictive means test by 1994, the available case law had not clarified the application of that standard. See Hicks v. Garner, 69 F.3d 22, 26 (5th Cir.1995) (stating that RFRA's "statutory contours are vague and its legal limits and standards have yet to be defined").
 
 
 18
 When the incidents that gave rise to this action took place, courts had used varied reasoning and reached contradictory conclusions on the constitutionality of prison grooming regulations. The prison officials can point to several decisions upholding such regulations in the face of free exercise challenges, albeit under less exacting standards than the strict scrutiny mandated by RFRA. See Scott v. Mississippi Dep't of Corrections, 961 F.2d 77, 80 (5th Cir.1992) (determining that hair-grooming regulations were "reasonably related to the prison's paramount security concerns"); Friedman v. Arizona, 912 F.2d 328, 331-33 (9th Cir.1990) (concluding that a regulation prohibiting beards does not impermissibly restrict Orthodox Jews' right to freely exercise their religion); Iron Eyes v. Henry, 907 F.2d 810, 814 (8th Cir.1990) (identifying a rational nexus between a short-hair regulation and penological concerns); Fromer v. Scully, 874 F.2d 69, 74-76 (2d Cir.1989) (sustaining a regulation limiting the length of beards to one inch); Martinelli v. Dugger, 817 F.2d 1499, 1507 (11th Cir.1987) (holding that beard and hair regulations were no greater than necessary to protect substantial government interests).
 
 
 19
 On the other hand, May finds support for his position in a number of cases analyzing prison practices under standards that approximate strict scrutiny. See Benjamin v. Coughlin, 905 F.2d 571, 576-77 (2d Cir.1990) (holding that pulling Rastafarians' hair back could accommodate religious beliefs without undermining the state's penological interests); Gallahan v. Hollyfield, 670 F.2d 1345, 1346-47 (4th Cir.1982) (concluding that a regulation prohibiting long hair was unconstitutional because less restrictive alternatives were available); Teterud v. Burns, 522 F.2d 357, 362 (8th Cir.1975) (striking a hair regulation because the "proof at trial established that the legitimate institutional needs of the penitentiary can be served by viable, less restrictive means"); see also Capoeman v. Reed, 754 F.2d 1512, 1515 (9th Cir.1985) (suggesting that if least restrictive means were clearly established as the test then the right to refuse a haircut would also be clearly established).
 
 
 20
 This mixed body of precedent does not provide sufficient authority to conclude that May's rights under RFRA were clearly established. The cases analyzing grooming regulations have not produced results consistent enough to charge the prison officials with knowledge of the right to maintain a religiously motivated hair cut. Cf. Malik v. Brown, 71 F.3d 724, 729-30 (9th Cir.1995) (concluding that the law governing the issue of religious name changes was clearly established because courts had consistently recognized the right to use the new name).
 
 
 21
 Moreover, even if May could identify a clearly established right, he could not show that a reasonable official would have understood that undoing his dreadlocks violated that right. Where "the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738. However, it is appropriate for the court to consider the information possessed by the prison officials at the time of the alleged violations. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3039-40. The fact that May never asserted a religious interest in his dreadlocks until after the incidents complained of establishes objective reasonableness. Thus, the prison officials also are entitled to immunity under the second prong of the analysis. See Act Up!/Portland, 988 F.2d at 871. We agree with the district court that the prison officials are immune from liability for damages.
 
 II. Free Exercise Claim
 
 22
 Although we affirm the grant of summary judgment as to May's claim for damages, we must evaluate whether the factual disputes in this case require further proceedings on May's claim for equitable relief. To sustain his free exercise claim and obtain declaratory and injunctive relief, May must demonstrate that requiring him to unbraid his dreadlocks substantially burdens his exercise of religion, and he must raise genuine issues as to the prison officials' assertion that no less restrictive means can accomplish EOCI's security objectives. 42 U.S.C. § 2000bb-1(b).
 
 A. Substantial Burden
 
 23
 The prison officials do not contest the centrality of dreadlocks to Rastafarianism, but they claim that EOCI's policy does not impose a substantial burden because May can keep his hair in dreadlocks except for those moments when he must be searched for security reasons. See Bryant, 46 F.3d at 949 (noting that the "interference must be more than an inconvenience") (quoting Graham v. Commissioner, 822 F.2d 844, 850-51 (9th Cir.1987), aff'd, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). The prison officials, however, have not put forth evidence that Rastafarianism ever permits unbraiding dreadlocks. May claims that undoing his dreadlocks, even temporarily, violates a biblical command and offends a fundamental tenet of his religion. See Hicks, 69 F.3d at 24 (stating that Rastafarianism mandates "never cutting or combing ones hair, instead allowing it to grow in dreadlocks") (emphasis added); see also Scott, 961 F.2d at 82 ("A Rastafarian's dreadlocks are a religious symbol of a bond with God."). Thus, May has raised a genuine issue as to whether the hair search procedure imposes a substantial burden on his exercise of Rastafarianism within the meaning of RFRA. See Stefanow, 103 F.3d at 1471.
 
 
 24
 May's compliance on a few occasions with the command to undo his dreadlocks does not undermine his description of the burden imposed; this court has held that a " 'use it or lose it' approach to religious exercise does not square with the Constitution." Malik v. Brown, 16 F.3d 330, 332 (9th Cir.1994). Moreover, May asserts that the hair search procedure forces him to make a choice between violating his religion or missing medical appointments and sacrificing freedoms. The Supreme Court has stated that "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" infringes on the free exercise of religion. Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). Here, the prison officials have conditioned "receipt of an important benefit upon conduct proscribed by a religious faith." Id. at 717, 101 S.Ct. at 1432; see also Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996) (concluding that the choice between submitting to a TB test or adhering to Rastafarian beliefs and enduring medical keeplock constitutes a substantial burden).
 
 
 25
 Accordingly, we will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism. See Harris v. Chapman, 97 F.3d 499, 503 (11th Cir.1996) (assuming that a prison's hair-length rule substantially burdens the exercise of religion). Pursuant to RFRA, the burden shifts to the prison officials to demonstrate that the regulation serves a compelling interest using the least restrictive means. Hamilton v. Schriro, 74 F.3d 1545, 1556 (8th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996).
 
 B. Compelling Interest
 
 26
 The Supreme Court has stated that "[c]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). May does not dispute that ensuring security during the transfer of inmates is a compelling state interest, and he has not raised a genuine issue as to whether searching inmates' hair before transport furthers that interest. Rather, May argues that the searches are not conducted in the least restrictive manner. We proceed, therefore, to analyze whether May has raised a genuine issue of fact as to less restrictive search alternatives available to officials at EOCI.
 
 C. Less Restrictive Means
 
 27
 This case presents our first opportunity to consider the contours of RFRA's strict scrutiny standard in the prison setting. The prison officials clearly bear the burden of production and persuasion on the least restrictive means issue. See Hamilton, 74 F.3d at 1556. However, even after the passage of RFRA, we owe substantial deference to the judgment of prison administrators. See S.Rep.No. 103-111, at 10 ("[T]he committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators."); see also Sandin v. Conner, 515 U.S. 472, ----, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) (noting that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); Gates v. Rowland, 39 F.3d 1439, 1448 (9th Cir.1994) (stating that judicial restraint is appropriate, especially where state penal systems are involved). Thus, the strict scrutiny standard that RFRA imposes has not been "fatal in fact" in the prison context. See Hamilton, 74 F.3d at 1556 ("It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA.").
 
 
 28
 The legislative history of RFRA also makes clear, however, that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." S.Rep.No. 103-111, at 10; see also Block v. Rutherford, 468 U.S. 576, 593, 104 S.Ct. 3227, 3236, 82 L.Ed.2d 438 (1984) (Blackmun, J., concurring) (expressing concern about a tendency to "substitute the rhetoric of judicial deference for meaningful review of constitutional claims in the prison setting"). In the combination of deference and scrutiny, Congress has issued a complex mandate, made even more complex in the summary judgment context where we do not seek to weigh, but only to identify, contradictory evidence. See Anderson, 477 U.S. at 249, 106 S.Ct. at 2510-2511.
 
 
 29
 This tension is especially troubling in a case such as this, where we are confronted with competing descriptions of the alternatives to EOCI's hair search procedure. Compare Harris, 97 F.3d at 504 (rejecting a Rastafarian's claim because the court was "unable to suggest any lesser means than a hair length rule for satisfying these interests, nor could Harris's counsel at oral argument"). May claims that the prison officials could employ a metal detector combined with manual inspection of his hair to search his dreadlocks for contraband. He also argues that transport officers could secure him during transfers with a "black box" restraint system that would prevent him from moving his hands.
 
 
 30
 In the affidavits supporting their motion for summary judgment, the prison officials maintain that May's hairstyle is thick enough to conceal a weapon, escape device, needle, or drugs and that feeling his hair would not necessarily reveal contraband hidden in the braids. They also point out that manual inspection of the dreadlocks poses a risk to prison staff in the event that sharp objects are hidden in May's hair. The prison officials similarly dismiss the possibility of using a metal detector, which they explain would not alert guards to the presence of nonmetal contraband.
 
 
 31
 Furthermore, the prison officials assert that the black box method would not satisfy their security needs. The black box restraint system consists of a hard plastic box that is placed over the lock apparatus on handcuffs to form a rigid link. A chain that runs through the box and around the prisoner's waist holds the prisoner's hands against his stomach. Secured in such a manner, May would be unable to obtain or utilize any form of contraband during transfers outside of EOCI. The prison officials concede that the black box is more secure than the typical method of transport. They contend, however, that the black box ultimately increases the risk of escape because it must be removed all at once; officers cannot release inmates one wrist at a time. May has not offered any evidence that contradicts the prison officials' explanation of the black box method. He merely speculates that the black box could be used in combination with other restraints to protect against escape. See Anderson, 477 U.S. at 254, 106 S.Ct. at 2513 (explaining that the nonmoving party has not raised a genuine issue if the evidence "is of insufficient caliber or quantity to allow a rational trier of fact" to find in his favor). Although it is not clear from the record precisely how the black box operates, we defer to the prison officials' expertise with penological technology and accept their sworn assertions that the black box precludes the use of other restraints.
 
 
 32
 We are persuaded by the prison officials' argument that the proposed alternatives would fall short of the security needs at EOCI. Accordingly, we conclude that the prison officials have met their burden under RFRA and we affirm the grant of summary judgment in their favor. We do not believe that our traditional deference to the experience and expertise of prison officials obviates our responsibility to evaluate the evidence and justifications that prison officials offer. Yet where the record reflects that prison administrators have surveyed the available alternatives, and they offer unrefuted evidence that security needs cannot be met by less restrictive means, we will not find constitutional fault with their methods.
 
 
 33
 Our holding should not suggest that prison officials can satisfy the demands of RFRA with mere assertions of unfulfilled security objectives. Where a prisoner challenges their justifications, prison officials must set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner. In some cases, this showing might call for an evidentiary hearing. See, e.g., Hamilton, 74 F.3d at 1547-48 (upholding regulations after a two-day evidentiary hearing that revealed no less restrictive alternatives); Campbell-El v. District of Columbia, 874 F.Supp. 403, 408 (D.D.C.1994) (concluding that the factual record was inadequate without discovery and a "detailed description by the government as to how [a prison policy] is the least restrictive means for furthering its goals"); Diaz v. Collins, 872 F.Supp. 353, 355, 359 (E.D.Tex.1994) (finding, after a magistrate judge "examined the exhibits and considered the testimony of the parties and witnesses" and "noted the demeanor of the parties" at an evidentiary hearing, that a hair length regulation was the least restrictive means of furthering health and security goals); Monroe v. Bombard, 422 F.Supp. 211, 216 (S.D.N.Y.1976) (requiring a fully developed factual record on whether a narrower limitation that did not "broadly stifle fundamental personal liberties" would suffice). Here, however, the prison officials have addressed the alternatives to the hair search in sufficient detail to obtain summary judgment. May has not offered any contradictory evidence, and the record does not contain adequate facts for a jury to return a verdict in May's favor.
 
 III. Additional Constitutional Claims
 
 34
 May alleges additional violations of his constitutional rights, focusing primarily on his confinement to DSU. May's claims lack merit, even construed broadly and viewed in the most favorable light. See Christensen v. Commissioner, 786 F.2d 1382, 1384-85 (9th Cir.1986) (pro se pleadings should be liberally construed, particularly where civil rights claims are involved).
 
 
 35
 May claims that his First Amendment rights were violated when his confinement to DSU prevented him from using the general prison library. But he was not denied access to legal materials, and he cites no authority for a First Amendment right supporting his claim to general library access. May also states that the prison officials conducted a visual body cavity search in violation of the Fourth Amendment. However, this court has found the type of search he describes reasonable. See Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir.1988). May further alleges that he was denied due process when he was placed in DSU pending a disciplinary hearing. May's due process claim fails because he has "no liberty interest in freedom from state action taken within the sentence imposed," Sandin, 515 U.S. at ----, 115 S.Ct. at 2298 (quotation omitted), and the Ninth Circuit explicitly has found that administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence. Toussaint v. McCarthy, 801 F.2d 1080, 1091-92 (9th Cir.1986). Moreover, May alleges that his Fourteenth Amendment rights were violated when he was classified as mentally ill, but nothing in the record suggests that he was so classified. In addition, no facts in the record support his claim of racial discrimination in the provision of medical care.
 
 
 36
 May's arguments under the Eighth Amendment are similarly unavailing. To prevail on a "conditions of confinement" claim, a plaintiff must show serious deprivation and deliberate indifference. See Wilson v. Seiter, 501 U.S. 294, 297-300, 111 S.Ct. 2321, 2323-2325, 115 L.Ed.2d 271 (1991). May's claims that he was denied the opportunity to exercise outdoors for 21 days while in DSU, and that he has received inadequate food, water, sanitation, and medical care, do not rise to this standard. Although exercise is "one of the basic human necessities protected by the Eighth Amendment," LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir.1993), a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation. Compare Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir.1994) (stating that a long-term deprivation of exercise is a denial of a basic human need in violation of the Eighth Amendment), cert. denied, --- U.S. ----, 115 S.Ct. 1695, 131 L.Ed.2d 559 (1995); Spain v. Procunier, 600 F.2d 189, 199-200 (9th Cir.1979) (concluding that the deprivation of outdoor exercise for a "period of years" contravenes the Eighth Amendment). May also has failed to allege facts establishing the deprivation of adequate food, drinking water, sanitation, or personal hygiene items. Moreover, there is no evidence of deliberate indifference to May's medical needs. See McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992) ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical needs in order for deliberate indifference to be established."). Finally, it is clear that confining an inmate to his cell for less than 24 hours in order to encourage compliance with prison security regulations does not rise to the level of deliberate indifference. Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995). Accordingly, we affirm the district court's grant of summary judgment on each of May's claims.
 
 CONCLUSION
 
 37
 We find that May's right to avoid loosening his dreadlocks was not clearly established at the time of the alleged violations of RFRA, and the prison officials are entitled to qualified immunity from damages. We further conclude that the prison officials have carried their burden under RFRA by demonstrating the absence of less restrictive alternatives to the hair search. Accordingly, we affirm the grant of summary judgment on each of May's claims.
 
 
 38
 AFFIRMED.
 
 
 
 *
 The Honorable Robert J. Bryan, United States District Judge for the Western District of Washington, sitting by designation