**Melvin Andrew JONES, Plaintiff,**

v.

**Sylvia GARCIA, Warden; W.J. Price, Captain, Defendants.**

**No. CIV. 03CV2441 J(WMC).**

United States District Court, S.D. California.

March 30, 2006.

Plaintiff, in pro per.

Susan E. Coleman, Deputy Attorney General, Office of the California Attorney General, San Diego, CA, for Defendants.

**ORDER: (1) ADOPTING IN PART MAGISTRATE JUDGE McCU-RINE'S REPORT AND RECOM-MENDATION; (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (3) DISMISSING PLAINTIFF'S COM-PLAINT**

JONES, District Judge.

On December 5, 2003, Plaintiff Melvin Andrew Jones, a state prisoner currently incarcerated at Calipatria State Prison ("Calipatria") in Calipatria, California, proceeding pro se and *in forma pauperis,* filed a Complaint pursuant to the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"). [Doc. No. 1.] Plaintiff alleges that while incarcerated at Calipatria, Defendants Sylvia Garcia, Warden, and Captain W.J. Price denied him outdoor exercise from December 27, 2001, through October 7, 2002, in violation of the Eighth Amendment to the U.S. Constitution. (*See* Compl. at 3.) Presently before the Court is the Report and Recommendation ("R & R") of Magistrate Judge William McCu-rine, Jr., issued on May 27, 2005, recommending that the Court grant Defendants'

Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. [Doc. No. 30.] To date, no objections have been filed. For the reasons set forth below, the Court **ADOPTS IN PART** the R & R and **GRANTS** Defendants' Motion for Summary Judgment.

### Background

Calipatria is a maximum-security prison with four main facilities: A, B, C, and D. (*See* Garcia's Decl. at 2.) Each facility consists of five housing units that house approximately 1,000 inmates. (*See id.*) Plaintiff is housed in facility B, which contains five housing units and two outdoor yards. (*See* Pl.'s Dep. at 6; Garcia's Decl. at 2.)

On December 2, 2001, a race riot broke out in facility B between approximately twenty black and white inmates. (*See* Garcia's Decl. at 2.) One inmate was seriously injured. (*See id.*) On December 3, 2001, Defendant Garcia placed facility B on a modified program with controlled showers, in-cell feeding, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement limited to "Hispanic and Other" [1] "critical" inmate workers. (*Id.*) After the riot, correctional staff investigated the cause and searched the yards and common areas for weapons. (*See id.*) On December 11, 2001, these searches were completed, but the modified program was continued for black and white inmates. (*See id.* at 3.) Normal programming was resumed for all other inmates. (*See id.*)

Beginning December 18, 2001, the acting chief deputy warden took gradual steps to return black and white inmates to normal programming. (*See id.*) On December 22, 2001, regular-contact visits resumed, and

---

1. The "Other" category refers to inmates not belonging to the black, Hispanic, or white groups. (*See* Garcia's Decl. at 2.)

on December 27, 2001, out-of-unit movement of black and white "critical" inmate workers resumed. (*See id.*) The acting chief deputy warden also authorized a modified yard-release program to begin on December 28, 2001. (*See id.*) However, on December 27, 2001, a white inmate killed a black inmate in facility B, and a subsequent search of the area revealed two inmate-manufactured weapons. (*See id.*) The acting chief deputy warden imposed an institutional lockdown. (*See id.* at 4.) On January 8, 2002, facilities A, C, and D returned to a modified yard schedule, but facility B remained on lockdown status. (*See id.*)

On February 5, 2002, all inmates, except black and white inmates, returned to normal programming. (*See id.*) Defendant Garcia states that black and white inmates remained on a modified program because of evidence suggesting that racial violence would likely result if these inmates were returned to normal programming. (*See id.*)

Defendant Garcia states she gradually restored privileges to black and white inmates in facility B throughout February and March 2002. (*See id.*) On April 7, 2002, one white inmate committed a battery with a weapon on another white inmate, leaving the inmate seriously injured. (*See id.* at 5.) Facility B remained on modified-program status until searches were completed. (*See id.*) On April 20, 2002, a combat broke out between two white and five black inmates in facility B. (*See* Garcia's Decl. at 5.)

Defendant Garcia states that on May 20, 2002, Defendant Price informed her that facility B's correctional staff believed yard privileges could be restored to black and white inmates without jeopardizing the safety and security of inmates and staff. (*See id.*) She authorized a modified yard-release program to begin on May 23, 2002.

(*See id.*) On May 23, 2002, a race riot erupted between the first six inmates (four white and two black) released to the yard. (*See id.*) Defendant Garcia states that, after this incident, Defendant Price informed her that he did not think what happened was indicative of future behavior, and recommended a second yard release. (*See id.* at 6.) On May 24, 2002, a second release was attempted, and again resulted in a race riot between four black and four white inmates. (*See id.*) After this occurrence, Defendant Garcia suspended black and white inmates' privileges in facility B, except for law library access, showers, medical appointments, and other passes under escort. (*See id.*)

On July 11, 2002, five Hispanic inmates attempted to murder a correctional officer in facility A. (*See id.*) Defendant Garcia imposed an institutional lockdown, but permitted black and white inmates in facility B to remain on a modified program. (*See id.*). On July 28, 2002, a black inmate committed a battery on a correctional officer. (*See id.*) Defendant Garcia continued the institutional lockdown, stating that it was necessary to prevent further violence. (*See id.*)

On August 6, 2002, an investigation revealed that the incident involving the Hispanic inmates was an isolated event, but that racial tensions continued between black and white inmates. (*See id.* at 6–7.) Defendant Garcia states that this necessitated the continued modified-program status for those inmates. (*See id.* at 7.)

On August 9, 2002, a meeting was held with six black inmate representatives and six white inmate representatives. (*See id.*) The black representatives refused to participate in the meeting, and a white representative who attempted to mediate during the meeting was subsequently assaulted. (*See id.*) Defendant Garcia states that at that point she decided to keep black and

white inmates in facility B on a modified program. (*See id.*)

By September 3, 2002, a number of agitators had been transferred out of facility B. (*See id.*) On September 23, 2002, Defendant Garcia resumed normal yard activities in facility B. (*See id.*) On that day, a riot erupted involving a group of nineteen black and white inmates. (*See id.*) Facility B was again placed on modified-program status. (*See id.*) Correctional staff interviewed participants involved in the riot and reported that some black inmates were still upset about the murder of a fellow inmate on December 27, 2001. (*See id.* at 8.)

On October 29, 2002, Defendant Garcia returned Units B1 and B2 to normal program status. (*See id.*) Due to the fact that an investigation revealed that black and white inmates were attempting to make peace, Defendant Garcia refrained from restoring the remainder of the units to normal status. (*See id.*) On December 17, 2002, normal yard privileges resumed, and two days later, all of facility B was under normal program status. (*See id.*)

Defendant Garcia states that her objectives throughout the lockdown periods were to "stop racially motivated violence, secure the safety of all inmates and prison staff, protect institutional property, facilitate an investigation into the racially motivated riots and their causes, determine the likelihood and nature of future violence, and discover and confiscate inmate manufactured weapons and contraband." (*Id.* at 9.)

### Legal Standard

The duties of the district court in connection with a magistrate judge's report and recommendation are set forth in rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court must "make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound discretion, chose to place on a magistrate's proposed findings and recommendations.").

When no objections are filed, the district court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. *See Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir.1974). Under such circumstances, the Ninth Circuit has held that "a failure to file objections only relieves the trail court of its burden to give *de novo* review to factual findings; conclusions of law must still be reviewed *de novo*." *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir.1989) (citing *Britt v. Simi Valley Unified Sch. Dist.*, 708 F.2d 452, 454 (9th Cir.1983)), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir.1996).

### Discussion

### I. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the grounds that there is no genuine issue as to any material fact and that, therefore, they are entitled to judgment as a matter of law. (*See* Mem. Supp. Mot. Summ. J. at 2.) Defendants state that Plaintiff did not meet the objective requirement of his Eighth Amendment claim. (*See id.* at 9–10.) Additionally, Defendants argue that Plaintiff failed to establish that Defendants harbored a subjective intent to violate Plaintiff's Eighth

Amendment rights. (*See id.* at 12.) Defendants contend the measures they instituted served the purpose of securing the safety and security of the staff and inmates. (*See id.* at 6.) Defendants also claim they are entitled to qualified immunity because they reasonably believed that instituting a modified program in response to violent incidents was lawful. (*See id.*) In the R & R, the Magistrate Judge recommends that Defendants' Motion for Summary Judgment be granted. The Magistrate Judge found that Plaintiff established genuine issues of material fact to satisfy the objective requirement of the analysis, but did not establish genuine issues of material fact to show Defendants deprived Plaintiff of outdoor exercise with the "deliberate indifference" to his health or safety necessary to support an Eighth Amendment violation. (*See* R & R at 11.) Upon conducting a de novo review of conclusions of law, this Court FINDS that the Magistrate Judge correctly concluded that Plaintiff established genuine issues of material fact to satisfy the objective requirement, but did not establish genuine issues of material fact to show an Eighth Amendment violation. However, this Court also **FINDS** that the Magistrate Judge incorrectly framed the subjective-intent analysis used to reach the latter conclusion. Therefore, for the reasons set forth below, the Court **ADOPTS IN PART** the R & R, and **GRANTS** Defendants' Motion for Summary Judgment.

### A. Relevant Law

### 1. Summary Judgment Standards

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*

477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: by presenting evidence that negates an essential element of the nonmoving party's case, or by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). "The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (*citing Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995) (*citing Anderson*, 477 U.S. at 252, 106 S.Ct. 2505) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient"). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

When making a determination on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### 2. Section 1983 Standards

In any Section 1983 claim, a claimant must prove that (1) the "conduct complained of was committed by a person acting under color of state law," and (2) the "conduct deprived [the claimant] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

### 3. Eighth Amendment Standards

■■■ The Eighth Amendment proscribes the "unnecessary and wanton infliction of pain" which must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Under the Eighth Amendment, prison officials have a duty to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Denial of outdoor exercise may give rise to an Eighth Amendment claim for deprivation of humane conditions of confinement if a prisoner can establish the objective and subjective requirements. *See Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir.1994); *Farmer*, 511 U.S. at 825–26, 114 S.Ct. 1970.

### B. Application

### 1. Objective Requirement

Plaintiff claims his Eighth Amendment right under the United States Constitution to be free from cruel and unusual punishment was violated when Defendants deprived him of outdoor exercise. (*See* Compl. at 3.) Defendants argue that Plaintiff did not fulfill the objective requirement of the Eighth Amendment analysis because, even though he was temporarily denied outdoor exercise, Plaintiff was still provided "adequate food, clothing, shelter, sanitation, medical care, and personal safety" and was allowed to exercise in his cell. (Mem. Supp. Mot. Summ. J. at 9–10.) For the reasons set forth below, this Court ADOPTS the part of the Magistrate

Judge's analysis and conclusion finding that Plaintiff raises genuine issues of fact under the objective prong. (*See* R & R at 6.)

■ Under the objective requirement of the Eighth Amendment analysis, the "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Ninth Circuit has stated that "some form of regular outdoor exercise is extremely important to the psychological and physical well being of . . . inmates." *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979) (holding that prisoners in long-term and continuous segregation must be provided regular outdoor exercise unless "inclement weather, unusual circumstances, or disciplinary needs" make it impossible). In *Allen v. Sakai,* 48 F.3d 1082, 1087–88 (9th Cir. 1994), a prisoner alleged that for six weeks he was only permitted forty-five minutes of outdoor exercise a week. The court denied the defendants' motion for summary judgment finding that the plaintiff had satisfied the objective requirement of the Eighth Amendment analysis by claiming he was deprived a basic human need. *See id.* at 1088; *Lopez v. Smith,* 203 F.3d 1122, 1133 (9th Cir.2000). In *Lopez v. Smith,* 203 F.3d 1122, 1133 (9th Cir.2000), the court found that a prisoner's allegation that he was deprived of all outdoor exercise for six and a half weeks satisfied the objective requirement of an Eighth Amendment analysis.

In the instant case, there is a genuine triable issue of fact as to whether Plaintiff met the objective requirement of his Eighth Amendment claim because he was denied outdoor exercise for approximately thirty-five weeks. (*See* R & R at 5.) Plaintiff was denied outdoor exercise for a period nearly six times longer than those alleged in *Allen* and *Lopez.* Furthermore, there is evidence that at times it was only black and white inmates who were deprived of outdoor exercise, while other inmates at Calipatria resumed normal programming. (*See* Garcia's Decl. at 4.) In viewing all inferences drawn from the underlying facts in the light most favorable to the nonmoving party, this Court **FINDS** that there is a genuine issue as to whether Plaintiff was unconstitutionally deprived of a basic need for outdoor exercise. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

**2. Subjective Requirement**

Summary judgment may still be appropriate if there are no genuine issues of material fact in dispute regarding whether the subjective prong of the Eighth Amendment analysis has been satisfied, despite the fact that there are genuine issues of fact regarding the objective prong of that analysis. *See Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. Defendants argue that there are no disputed facts to suggest that they "inflicted unnecessary and wanton pain on Plaintiff by denying [him] outdoor exercise . . . or that they did so 'maliciously and sadistically for the very purpose of causing harm.'" (Mem. Supp. Mot. Summ. J. at 12); *LeMaire v. Maass,* 12 F.3d 1444, 1452 (9th Cir.1993). In the R & R, the Magistrate Judge concludes that the evidence in the record does not "support Plaintiff's claim that the period without exercise, which began as a result of racial tension and violence and culminated in an inmate's murder in Calipatria's B Facility, was the result of Defendants' 'deliberate indifference' or was motivated by 'malicious' and 'sadistic' intent to harm or punish him." (R & R at 6.) This Court **ADOPTS** the Magistrate Judge's conclusion that there is no genuine issue of material fact as to whether Defendants harbored the requi-

site subjective intent, but **REJECTS** the Magistrate Judge's analysis of whether Defendants were motivated by malicious and sadistic intent to harm or punish Plaintiff.

■ Since Plaintiff challenges the conditions of his confinement with regard to denial of outside exercise pursuant to the Eighth Amendment, the correct subjective-requirement analysis is whether Defendants acted with deliberate indifference to his health and safety. The analysis is not, as the Magistrate Judge states, whether Defendants were motivated by a malicious and sadistic intent to harm Plaintiff. (*See* Compl. at 3; R & R at 6); *Farmer*, 511 U.S. at 826, 834, 114 S.Ct. 1970. In cases where a prisoner is challenging prison conditions in violation of the Eighth Amendment, the subjective-requirement analysis should focus on whether the prison official acted with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 826, 834, 114 S.Ct. 1970. A prison official acts with deliberate indifference only if he or she "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 825, 114 S.Ct. 1970. By contrast, in cases where a prisoner is claiming a prison official used excessive physical force in violation of the Eighth Amendment, the subjective-requirement analysis should focus on whether the prison official applied force "maliciously and sadistically for the very purpose of causing harm" or with a "knowing willingness that [harm] occur." *Whitley v. Albers*, 475 U.S. 312, 320, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Hudson v. McMillian*, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "This standard of purposeful or knowing conduct is not ... necessary to satisfy the [subjective intent] requirement of deliberate indifference for claims challenging conditions of confinement ...." *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970.

■ There are no genuine issues of material fact to show that Defendants were deliberately indifferent to Plaintiff's health and safety in denying him outdoor exercise. Defendants demonstrated, instead, an interest in protecting the staff and inmates from future racially-motivated violence. (*See* Garcia's Decl. at 9.) The evidence establishes that Plaintiff's outdoor exercise was suspended only after racial tensions erupted into violence in facility B on December 2, 2001. (*See id.* at 2.) From December 2, 2001, through October 7, 2002, the period of time Plaintiff was denied outdoor exercise, there were at least six other incidents of violence between black and white inmates, one of which resulted in a homicide. (*See id.* at 2–8.) On May 23 and May 24, 2002, respectively, Defendants attempted to restore yard privileges to inmates in facility B, but both attempts failed because race riots erupted as soon as the first inmates were released into the yard. (*See id.* at 5–6.) Defendants' every attempt to gradually return inmates in facility B to normal programming was thwarted by an outbreak of violence. (*See id.* at 2–8.) This evidence does not even create the inference that the Defendants knew Plaintiff faced a substantial risk of serious harm and disregarded that risk. *Farmer*, 511 U.S. at 825, 114 S.Ct. 1970. To the contrary, the evidence establishes that if Defendants had actually permitted Plaintiff outdoor exercise, he would have been in more danger of substantial harm than if he had been denied outdoor exercise due to the violent atmosphere inherent in facility B at that time. In sum, the evidence supports Defendant Garcia's assertion that she was not acting with deliberate indifference in denying Plaintiff outside exercise, but rather that she was acting with a desire to ensure the safety and security of the staff and inmates. (*See id.* at 9.)

Accordingly, and for the reasons set forth above, the Court **ADOPTS** the Mag-

istrate Judge's conclusion that there is no genuine issue of material fact as to whether Defendants acted with the subjective intent necessary to establish Plaintiff's Section 1983 claim that his Eighth Amendment rights were violated. However, the Court **REJECTS** the Magistrate Judge's subjective-requirement analysis. Still, since there is no genuine issue of material fact under the subjective-requirement analysis of this Court, Defendants' Motion for Summary Judgment IS **GRANTED**.

### C. Qualified Immunity

Because the Court **FINDS** there is no triable issue regarding the alleged violations of Plaintiff's Eighth Amendment rights, the Court does not need to reach the issue of qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### Conclusion

For the foregoing reasons, the Court (1) **ADOPTS IN PART** the R & R, (2) **GRANTS** Defendants' Motion for Summary Judgment, and (3) **DISMISSES** Plaintiff's Complaint under the Civil Rights Act, 42 U.S.C. § 1983.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MCCURINE, United States Magistrate Judge.

### I.

### INTRODUCTION

Melvin Jones (hereinafter "Plaintiff"), a state prisoner currently incarcerated at Calipatria State Prison in Calipatria, California, is proceeding *pro se* and in forma pauperis with a Complaint filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated at Calipatria, he was denied all outdoor exercise from December 27, 2001 through October 7, 2002, in violation of the Eight Amendment. (Compl. at 3.)

Defendants have filed an Answer [Doc. No. 10] to the Complaint, and a Motion for Summary Judgment pursuant to Fed. R.Civ.P. 56 [Doc. No. 20]. The Court has notified Plaintiff of the requirements for opposing summary judgment pursuant to *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc) and *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir.1988) [Doc. No. 26].

### II.

### FACTUAL ALLEGATIONS

Plaintiff alleges that from December 27, 2001 through October 7, 2002, Defendant Garcia, the Warden of Calipatria, and Defendant Price, a Correctional Captain at Calipatria, "deprived me of the necessary humane conditions by denying me any outdoor exercise." (Compl. at 3.) Plaintiff claims that the denial of outdoor exercise for that entire period violated his Eighth Amendment right to be free from cruel and unusual punishment. (*Id.*)

### III.

### DISCUSSION

Defendants contend they are entitled to summary judgment because there are no genuine issues of material fact in dispute which, if proven, would support a claim for denial of Plaintiff's Eighth Amendment

rights. (Defendants' Memorandum of Points and Authorities in Support of Summary Judgment "Def.'s MSJ Mem." at 2.) Specifically, Defendants contend that Plaintiff has failed to set forth any specific factual allegations demonstrating that Defendant Garcia or Defendant Price harbored a subjective intent to violate Plaintiff's civil rights. (*Id.* at 12.) Defendants submit evidence which demonstrates the existence of ongoing racial tension between inmates during the relevant period, including numerous incidents of violence, which they contend necessitated a period of lock down and modified programming. (*Id.* at 2–6.) Defendant Garcia contends that she took numerous, reasonable measures during this period to halt the violence and return the facility to normal programming, and the fact that additional racial incidents were ongoing during this period confirms that the situation was difficult and not capable of a simple solution. (*Id.*) Defendants also contend that all measures taken were intended to achieve the legitimate goals of (1) halting racially-motivated violence and (2) ensuring the safety of both staff and inmates. (*Id.*) Finally, Defendants contend that, even assuming Plaintiff's Eighth Amendment rights were violated, they are entitled to qualified immunity. (*Id.* at 12–17.)

## A. *Summary Judgment Standards*

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *Id.* at 322–24, 106 S.Ct. 2548.

The opposing party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court may not weigh evidence or make credibility determinations on a motion for summary judgment; rather, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Furthermore, in order to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact. *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986). Instead, the nonmoving party must designate specific facts which show there is a genuine issue for trial. *Id.; Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Here, there is no dispute that the Defendants acted under color of state law. Thus, the resolution of the summary judgment motion turns on the second inquiry: whether a genuine issue of material fact exists to show that the conduct of the Defendants deprived Plaintiff of some right, privilege, or immunity protected by the Constitution or laws of the United States.

### B. *Defendants' Motion for Summary Judgment*

Defendants essentially contend there are no genuine issues of material fact in dispute which, if proven, would demonstrate that they acted with the requisite subjective intent to violate Plaintiff's Eighth Amendment rights because the denial of outdoor exercise was necessary in light of the events at the prison during the relevant time period. Plaintiff considers a period of nearly ten months without outdoor exercise a violation of his Eighth Amendment rights as a matter of law.

"Whatever rights one may lose at the prison gates,...the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes." *Spain v. Procunier*, 600 F.2d 189, 193–94 (9th Cir.1979) (citation omitted). The Eighth Amendment, however, is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity one might find desirable. *Rhodes v. Chapman*, 452 U.S. 337, 347, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982). Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Rhodes*, 452 U.S. at 347, 101 S.Ct. 2392. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *see also Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose lockdowns to control institutional disturbances, the conditions imposed during the lockdown may constitute cruel and unusual punishment under the Eighth Amendment. *See Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980) (denial of outdoor exercise may give rise to Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective); *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970; *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir.1994).

"Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682 F.2d at 1246; *Farmer*, 511 U.S. at 833, 114 S.Ct. 1970; *Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir. 1981).

The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." *Allen*, 48 F.3d at 1087. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970.

### 1. *Objective Requirement*

Plaintiff alleges that the conditions imposed by Defendants constituted cruel and unusual punishment because he was denied outdoor exercise for nearly ten months. (Compl. at 3.) The Ninth Circuit has stated that "regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain,* 600 F.2d at 199 (holding that prisoners in long-term and continuous segregation must be provided regular outdoor exercise unless "inclement weather, unusual circumstances, or disciplinary needs" make it impossible). The court in *Hayward* recognized that when a lockdown is instituted in response to a genuine emergency, the decisions regarding when and how to provide for outdoor exercise "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward,* 629 F.2d at 603.

Here, the initial loss of outdoor exercise arose from a violent race riot involving approximately twenty White and African–American inmates on December 2, 2001 in Calipatria's Facility B. (Def.'s MSJ Mem. at 2, *see* Garcia Decl.) As a result of the riot, Warden Garcia implemented modified programming for Facility B which took effect the next day, and which provided for in-cell feeding, controlled showers, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement of Hispanic and Other [1] critical inmate workers. (Garcia Decl. at 4.) The lockdown ended on January 8, 2002, and by February 5, 2002, all inmates at Calipatria, except the White and African–American inmates on Facility B, had returned to normal programming. (*Id.*)

"Although exercise is 'one of the basic human necessities protected by the Eighth Amendment' . . . a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (twenty-two days insufficient to establish Eighth Amendment violation), quoting *LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993). Here, although Plaintiff was denied outdoor exercise for approximately 250 days, Defendants claim that Plaintiff (1) was not confined to his cell during the periods of modified programming and lockdowns, that Plaintiff's cell was large enough to perform various exercises, including push-ups, sit-ups, bicep curls, leg squats, running in place, and stretching, (2) was permitted to shower every two to three days and (3) was permitted to leave the cell for telephone calls. (*See* Def.'s MSJ Mem. at 10; Garcia Decl. at 9.)

The Court finds evidence in the record sufficient to create genuine issues of fact as to whether the denial and/or limitations on Plaintiff's outdoor exercise from December 2001 through October 2002 meet the objective standards required to support an Eighth Amendment violation. *See e.g., Lopez v. Smith,* 203 F.3d 1122, 1133 (9th Cir.2000) (en banc) (finding six and one-half weeks deprivation of "all access to outdoor exercise" sufficient to satisfy Eighth Amendment's objective requirements); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996), *as amended* 135 F.3d 1318 (finding triable issues of facts existed as to whether a six-month deprivation of outdoor exercise due to Plaintiff's placement in the Intensive Management Unit violated the Eighth Amendment). However, despite the fact there are genuine issues of fact regarding the objective prong,

---

1. The "Other" category refers to inmates not belonging to the African–American, Hispanic or White groups. (Garcia Decl. at 2.)

and even assuming the objective prong was satisfied as a matter of law, summary judgment is still appropriate if there are no genuine issues of material fact in dispute regarding whether the subjective prong has been satisfied. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.

## 2. Subjective Requirement

In order to avoid summary judgment, Plaintiff must also show there are triable issues as to the Eighth Amendment's *subjective* requirement. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. The Court finds no evidence in the record to support Plaintiff's claim that the period without outdoor exercise, which began as a result of racial tension and violence and culminated in an inmate's murder in Calipatria's B Facility, was the result of Defendants' "deliberate indifference" or was motivated by "malicious" and "sadistic" intent to harm or punish him. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970; *Lopez,* 203 F.3d at 1133.

The evidence before the Court shows that the suspension of outdoor exercise began only *after* racial tensions in Calipatria's B Facility erupted into violence on December 2, 2001, between White and African–American inmates housed in Unit B3. (Garcia Decl. at 2.) One inmate sustained serious injury and one weapon was recovered. (Garcia Decl. 2 & Ex. A, CDC Form 837A Incident Report Log No. CAL–FB3–01–12–0657.)[2] Defendant Garcia instituted modified programming for Facility B beginning the day after the race riot. (Garcia Decl. at 2.) The modified programming included in-cell feeding, controlled showers, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement of Hispanic and Other critical inmate

workers. (*Id.*) Garcia indicates she instituted the modified programming in order "to maintain and ensure the safety and security of inmates and correctional staff while the cause of the riot was investigated, and the facilities and common areas were searched for weapons." (*Id.*) The searches were completed by December 11, 2001, and although modified programming continued for African–American and White inmates, normal programming was restored for all other inmates. (*Id.* at 3.)

Beginning on December 18, 2001, African–American and White inmates began a gradual return to normal programming by being allowed to shower without handcuffs. Regular contact visits were resumed on December 26. On December 27 African–American and White critical workers were authorized to leave their housing units. (Garcia Decl. at 3.) On December 27, 2001, a White inmate killed an African–American inmate at Calipatria and two inmate-manufactured weapons were found. (*Id.*) Although Garcia was away on vacation from December 22, 2001 through January 6, 2002, the Acting Chief Deputy Warden, with the permission of the Regional Administrator of the CDC, declared a state of emergency and imposed an institutional lockdown based on the homicide as well as other incidents of inmate-on-inmate violence in other facilities. (*Id.* at 4.) The institutional lockdown began on December 27 ended on January 8, 2002. A modified program was instituted because of continuing intelligence that racial violence was likely to result if African–American and White inmates in Facility B were returned to normal programming. (*Id.* at 3–4.)

Garcia states that she continued to restore privileges to African–American and White inmates on Facility B throughout

---

**2.** The CDC Form 837A is a Crime Incident Report which Garcia states are prepared by persons with knowledge of the events recorded therein and are kept in the ordinary course of business of the CDC. Plaintiff does not challenge the authenticity of these documents.

February and March: on February 23, 2002, these inmates were authorized to received packages; on February 26, in-cell religious programming was authorized; on March 13, the in-cell canteen list was modified to include additional items; on March 19, contact visits resumed and law library access was expanded to include all inmates; on March 27, the inmates were authorized to make phone calls during their shower time and the handcuff requirement for shower escorts was eliminated. (*Id.* at 4.)

Unfortunately, on April 7, 2002, a battery on an inmate with a weapon occurred in Unit B5 in Facility B between two White inmates, which resulted in serious injury. (Garcia Decl. at 5 & Ex. C, CDC Form 837A Incident Report Log No. CAL–FB5–02–04–0141.) A work stoppage occurred on April 8, 2002, and based on these two incidents Facility B was ordered to remain on modified programming until additional searches were completed. (Garcia Decl. at 5.) On April 20, 2002, a mutual combat incident occurred in Facility B Unit B3, involving two White and five African–American inmates. (Garcia Decl. at 5 & Ex. D, CDC Form 837A Incident Report Log No. CAL–FB3–02–04–0164.)

Garcia further states that on or about May 20, 2002, Acting Facility Captain Price informed her that correctional staff in Facility B believed that yard privileges could be restored without unreasonably jeopardizing inmate and staff safety, and Price presented Garcia a plan for restoring yard privileges to White and African–American inmates. (Garcia Decl. at 5.) The plan called for modified yard release to begin on May 23, 2002, with the release of African–American and White inmates from a housing unit section to be randomly selected by Captain Price, with the identity of the unit to be kept secret until the morning of the release. (*Id.*) Garcia au-

thorized the plan, which provided that inmates would have yard privileges between 8:30 a.m. and 11:30 p.m. Monday through Friday. Inmates choosing to participate would be handcuffed and escorted from their cells to the housing unit sally port in T-shirts, boxers and shoes; once in the sally port, they would submit to an unclothed body search, dress and enter the yard; the process would be repeated alternating between releasing White and African–American inmates in the section were on the yard. (*Id.*)

On May 23, 2002, another violent race riot erupted between the first six inmates to be released on the yard, which involved two African–American and four White inmates. (Garcia Decl. at 5 & Ex. E, CDC Form 837A Incident Report Log No. CAL–FBY–02–05–0231.) Captain Price informed Garcia that in his opinion the first release was not indicative of the behavior of other inmates, and that they should attempt the release of inmates of inmates from a different section of the housing unit. (Garcia Decl. at 6.) The second release occurred on May 24, 2002 and yet another race riot erupted between four African–American and four White inmates during that release. (Garcia Decl. at 6 & Ex. F, CDC Form 837A Incident Report Log No. CAL–FBY–02–05–0234.) Price then informed Garcia "that the African–American and White inmates in Facility B were not ready for yard release, and that more time and effort were required to ensure the safety and security of inmates and staff." (Garcia Decl. at 6.) Garcia indicates she temporarily suspended all privileges for African–American and White inmates on Facility B with the exception of law library access, showers, medical appointments and other passes under escort. (*Id.*)

In-cell canteen purchases were restored on July 10, 2002, as part of a continuing

attempt to return to normal programming. (Garcia Decl. at 6.) However, on July 11, 2002, five Hispanic inmates attempted to murder a correctional officer in Facility A; the officer received numerous stab wounds and other staff members were injured. (*Id.*) As a result, the entire institution was placed on lockdown. (*Id.*) On July 28, 2002, an African–American inmate committed a battery on a correctional officer causing severe injuries. Garcia states that in her opinion a continuation of the lockdown was necessary to prevent further violence. (Garcia Decl. at 6 & Ex. H, CDC Form 837A Incident Report Log No. CAL–FB2–02–07–0326.)

On August 6, 2002, investigation revealed that the incident involving the Hispanic inmates was an isolated event, but the investigation into the other incident revealed that African–American and White inmates continued to have ongoing problems which necessitated maintaining a modified program. (Garcia Decl. at 6–7.) On August 9, 2002, a meeting was held with six African–American inmate representatives and six White inmate representatives. The African–American inmates refused to participate and left the meeting; a White inmate who attempted to mediate between the groups was subsequently assaulted. (*Id.* at 7.) Due to this series of events, the African–American and White inmates on Facility B were continued on modified programming. (*Id.*)

Garcia states that by September 3, 2002, additional agitators had been identified and transferred out of Facility B, and the lockdown ended on that date. (Garcia Decl. at 7.) The modified program continued for African–American and White Facility B inmates. (*Id.*) A number of privileges were restored on these inmates on

September 23, 2002. However, *that same day* another race riot occurred involving nineteen inmates when a group of African–American inmates assaulted a group of White inmates. (Garcia Decl. at 7 & Ex. I, CDC Form 837A Incident Report Log No. CAL–FBP–02–09–0417.)

On October 5, 2002, African–American and White critical workers were released to their assignments, and allowed thirty-minute non-contact visits. (Garcia Decl. at 7.) On October 29, 2002, Units B1 and B2 were returned to their normal program status, normal yard privileges were restored on December 17, 2002, and Facility B was returned to its normal programming on December 19, 2002. (*Id.* at 8.)

Thus, the record is replete with facts which reveal that restrictions on outdoor exercise were instituted for the primary purpose of preventing further race-based attacks, injuries and homicides. In addition, Warden Garcia claims, and all documentary evidenced offered by both Defendants and Plaintiff related to the lockdown shows, that the conditions and restrictions Garcia imposed were designed, implemented and continually modified in an effort to "stop [the] racially-motivated violence, secure the safety of all inmates and prison staff, protect institutional property, facilitate an investigation into the racially motivated riots and their causes, determine the likelihood and nature of further violence, and discover and confiscate inmate-manufactured weapons and contraband." (Garcia Decl. 9.)

Plaintiff does not come forward with evidence to refute Warden Garcia's explanations as to the circumstances and motivations underlying her decision to implement the May 23, 2002 modified yard release program.[3]

---

3. The modified yard release program provided for African–American and Caucasian in-

mates to be released on the yard on Mondays

As set forth above, determinations such as how long denial of outdoor exercise is necessary "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward,* 629 F.2d at 602. Defendants have demonstrated that the yard restriction was imposed as a result of race riots, that each time restrictions were relaxed further serious racial violence erupted, that trial yard releases resulted in immediate racial violence, and that the yard releases were successfully restored only after a period of investigation, mediation and eventual transfer of certain inmates from Facility B.

Defendants claim that racial unrest cannot be resolved unless warring factions resolve their racial difference, and that such process is facilitated by allowing inmates to restore order within their own power structures. (Garcia Decl. at 10–11.) Defendants contend this is accomplished by following proven procedures such as were taken here, which provided an opportunity for the warring factions to communicate with each other while limiting their opportunities for counterproductive activities. (*Id.*) Defendants state that segregated yard releases were not an option because they are against CDC policy, and, it is the understanding of both Defendants that segregated yard releases have been ruled to be unconstitutional. (Garcia Decl. at 11; Price Decl. at 6.) Plaintiff has not come forward with any evidence to counter the Defendants' overwhelming evidence that the period of suspension of outdoor exercise was a necessary reaction to the racial unrest at the prison. Further, Plaintiff has not produced evidence to demonstrate that the Defendants' actions were taken with some other intention, much less a malicious intent.

Thus, this Court finds no genuine issues of material fact exist to show that Defendants deprived Plaintiff of outdoor exercise with the "deliberate indifference" to his health or safety necessary to support an Eighth Amendment violation. *See Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. Rather, the uncontroverted evidence establishes that the suspension of outdoor exercise was a reasonable and necessary response to ongoing racial violence at Calipatria. Plaintiff has come forward with no evidence to support a finding that the initial suspension or delay in restoration of outdoor exercise amounted to a violation of his Eighth Amendment rights. Accordingly, it is recommended that Defendants' motion for summary judgment be **GRANTED**. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Berg,* 794 F.2d at 459.

## C. Qualified Immunity

Because the Court has found no triable issue regarding the alleged violations of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); *see also Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## IV.

### *CONCLUSION AND RECOMMENDATION*

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

to Fridays from 8:30 a.m. to 11:30 a.m. on a random basis.

Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered granting Defendant's Motion for Summary Judgment pursuant to Fed. R.Civ.P. 56 [Doc. No. 20].

**IT IS ORDERED** that no later than, June 27, 2005, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than July 11, 2005. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan,* 158 F.3d 449, 455 (9th Cir.1998); *Martinez v. Ylst,* 951 F.2d 1153, 1156 (9th Cir.1991). May 27, 2005.