Dale **HURD**, Plaintiff,

v.

Sylvia **GARCIA**, Warden, et al., Defendants.

No. 02CV460–BEN.

United States District Court, S.D. California.

Sept. 28, 2006.

1034

▮▮▮▮▮▮

▮▮▮▮

▮▮▮▮▮▮▮

Dale Hurd, Calipatria, CA, Pro se.

Deputy Attorney General G. Michael German, Department of Justice, San Diego, CA, for Defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TERMINATING CASE [Docket No. 131]

BENITEZ, District Judge.

Plaintiff Dale Hurd ("Hurd" or "Plaintiff"), a prisoner at Calipatria State Prison, has filed a *pro se* Third Amended Complaint ("Complaint") under 42 U.S.C. § 1983 against prison officials Warden Garcia, Captain W.J. Price, Lieutenant R. Anti, Sergeant Richards, and Correctional Officers Does 1–10. Hurd claims that the conditions of his confinement at Calipatria during a lock down of the facility from December 2001 to March 2002 violated his rights to due process, equal protection and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, that the Defendants failed to protect him from assault by another inmate in violation of the Eighth Amendment, and that he was retaliated against for the exercise of his First Amendment rights. He seeks monetary damages and an injunction preventing any future long-term deprivations of outdoor exercise.

Defendants moved for summary judgment on all of the claims presented in Plaintiff's Complaint. The Honorable United States Magistrate Judge William McCurine Jr. issued a thorough Report and Recommendation ("Report"), recommending Defendants' Motion be granted, and allowed the parties until September 18, 2006 to file objections to the Report. To date, no objections to the Report have been filed. Nor has there been any request for additional time to file objections.[1]

Title 28 U.S.C. § 636(b)(1)(C) provides: "A judge of the [district] court shall make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made." Thus, the governing "statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo **if objection is made,** but not otherwise." *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003) (en banc) (emphasis in original); *see also id* ("Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct.") (citation omitted)); *Wang v. Masaitis,* 416 F.3d 992, 1000 n. 13 (9th Cir.2005) ("Of course, *de novo* review of a [Report] is only required when an objection is made to the [Report].") (citation omitted)). Notwithstanding Hurd's failure to object, the Court has carefully reviewed the Report and the entire file. Judge McCurine's analysis is supported by the record, and is sound and well-reasoned. Accordingly,

1. Since the Report, the Court has received a filing from Hurd titled: "Submission of Supplemental Affidavits In Support Of Opposition To Defendants' Summary Judgment Motion." The Court has reviewed the supplemental affidavits submitted. The affidavits do not object to any portion of the Report. Rather, they are cumulative of the exhibits Hurd has already filed, and discussed by Judge McCurine, in Opposition to Defendants' Motion.

the Report is **ADOPTED IN FULL.** For the reasons stated in the Report, Defendants' Motion is **GRANTED.** The case is terminated. The Clerk shall close the file.

**SO ORDERED.**

### REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McCURINE, United States Magistrate Judge.

Defendants' summary judgment motion has been referred to Magistrate Judge McCurine pursuant to Local Civil Rule 72.3. This motion is appropriate for submission on the papers and without oral argument pursuant to Local Rule 7.1(d)(1).

### I. PROCEDURAL BACKGROUND

Dale Hurd, (hereinafter "Plaintiff"), a state prisoner currently incarcerated at Calipatria State Prison in Calipatria, California, is proceeding *pro se* and *in forma pauperis* with a Complaint filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983. In his Third Amended Complaint[1] ("TAC"), Plaintiff seeks injunctive relief, compensatory, and punitive damages against Warden Garcia, Captain W.J. Price, Lieutenant R. Anti, Sergeant Richards, and Correctional Officers Does 1–10, based upon the following claims:

Count 1: The conditions of his confinement at Calipatria during a lock down of the facility from December 2001 to March 2002 violated his rights to due process, equal protection and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments;

Count 2: In violation of the Eighth Amendment Plaintiff was deprived of specific entitlements which imposed an atypi-cal and significant hardship on Plaintiff "in relation to the ordinary incidents of life in prison." (TAC at p. 7.)

Count 3: In violation of the equal protection clause of the Fourteenth Amendment, Plaintiff was denied outdoor exercise based on his racial classification;

Count 4: In violation of the Eighth Amendment, Plaintiff suffered physical injury and loss of personal property due to Defendant's "callous indifference to Plaintiff's safety" and right to be protected from harm by fellow inmates. (TAC at p. 13.)

Count 5: In violation of the Eighth Amendment, "defendants acted recklessly in conscious disregard of that risk" which caused Plaintiff to be assaulted on May 4, 2002.

Count 6: In violation of the Eighth Amendment, Defendants "did act under color of law to create a special danger that caused harm to Plaintiff." (TAC at p. 23.)

Count 7: Plaintiff's First Amendment right to free speech was violated when all his writing materials were confiscated and when he was subject to retaliation for filing grievances. (TAC at p. 27.)

Count 8: Plaintiff seeks declaratory relief against Defendant Garcia based on his Eighth Amendment claims.

Count 9: Plaintiff seeks declaratory relief against Defendant Garcia based on his Fourteenth Amendment claims.

Count 10: Plaintiff seeks injunctive relief based upon the claims presented.

### II. Factual Allegations

*Counts 1–3:*

Plaintiff alleges that on December 2, 2001, Defendant Garcia, the Warden of

---

**1.** Plaintiff's third amended complaint is unverified. Therefore, it may not be used as an opposing affidavit under Fed.R.Civ.P. 56. To "verify" a complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the pains and penalties of perjury." *Schroeder v. McDonald,* 55 F.3d 454, 460 n. 10 (9th Cir.1995)

Calipatria, ordered Facility B, where Plaintiff was housed, to be placed on lock down status. (TAC at 3.) The lock down continued until approximately March 27, 2002, and for that entire period Plaintiff was locked in a six-foot by twelve-foot cell with one other inmate for twenty-four hours with the exception of a ten or fifteen-minute shower every three to five days. (Id.) Plaintiff states that he was denied any exercise time from December 2, 2001, until May 1, 2002. (Id. at 6.) He alleges that Defendant Garcia was aware that a total prohibition on exercise time for more than three months had been consistently held to violate the Eighth Amendment, that Garcia could have arranged for segregated yard time during that period but continued for longer than necessary a "modified program" which provided that Plaintiff, who is classified as Caucasian, continued to be restricted while inmates of other races were allowed to return to regular programs. (Id at 3–5, 12.) As a result, Plaintiff alleges Defendant Garcia violated his right to be free from cruel and unusual punishment under the Eighth Amendment (count 1), his right to due process of law under the Fourteenth Amendment (count 2), and his right to equal protection under the Fourteenth Amendment (count 3).

*Counts 4–6:*

Plaintiff alleges that since December 2, 2001, a prison gang controlled by Caucasian supremacists has operated at Calipatria. Further, they give orders and extort property from Caucasian inmates in exchange for protection from inmates of other races. (TAC at 13.) Plaintiff alleges that the Defendants use the gang to control and discipline Caucasian inmates, and that the gang operates with the knowledge and tacit approval of all the Defendants named in this action, who, in addition to Warden Garcia, are identified as Captain W.J. Price, Lietenant R. Anti, Sergeant S.

Richards, and Correctional Officers Does 1–10. (TAC at 13–17.)

Defendants allegedly knew of and furthered the gang's plan to require all Caucasian inmates to attack any Black inmate any time they had the chance, a plan backed by the threat that the gang would assault any Caucasian inmate who failed to follow the plan. (Id.) The Defendants allegedly ignored requests by Caucasian inmates who sought protective custody after failing to assault Black inmates. (Id.) A program status report was issued on April 30, 2002, which stated that Plaintiff would continue to be housed with a Black inmate, and the entire Facility B population therefore knew that Plaintiff had the opportunity to attack a Black inmate. (Id. at 16–17.)

Plaintiff was transferred to Facility C on May 1, 2002, despite the fact that the Defendants allegedly knew that Facility C was not safe and that he might be attacked. (Id. at 16.) On May 4, 2002, Plaintiff was assaulted by another inmate, in retaliation for Plaintiff's failure to attack a Black inmate when he had the chance. (Id.) Plaintiff suffered bruises, lacerations, cracked ribs and partial loss of vision as a result of the assault, and his personal property was stolen from his cell during the assault. (Id. at 17.) Plaintiff claims Defendants' actions violated his Eighth Amendment rights (counts 4–6). (Id. at 13, 20, 23.)

*Counts 7–10:*

Plaintiff claims that Defendants retaliated against him in response to Plaintiff's free speech activities. (Id. at 27.) Plaintiff states that he is the Chairman of the Men's Advisory Counsel ("MAC") at Calipatria, and that he refuses requests from other inmates to file grievances in his capacity at MAC Chairman regarding the conditions at Calipatria because he fears retaliation from prison staff. (Id. at 32.

check and cite Exhibit W). However, Plaintiff submitted an inmate grievance on December 18, 2002, complaining of the lock down conditions on Facility B. Additionally, on March 6, 2002, Plaintiff informed Warden Garcia in a letter of his intention to file a civil rights complaint regarding the lock down. (Id.) In response to his letter to the warden, Plaintiff alleges that on March 16, 2002, he was handcuffed and taken to Defendant Anti's office where Anti stated "take the cuffs off of him, if we don't like what he has to say we'll just shoot him." (Id. at 28.) Plaintiff again wrote to Defendant Garcia on April 7, 2002, complaining about the lock down conditions. (Id. at 28.)

On April 11, 2002, every cell in housing unit B4 was searched by a correctional officer. Plaintiff's cell was searched by Defendant Richards, a Correctional Sergeant. (Id.) Defendant Richards allegedly confiscated every ink pen and every piece of paper in Plaintiff's cell. (Id.) On April 18, 2002, Plaintiff met with Senator John Burton and his staff. At that meeting Plaintiff complained of the climate of lawlessness among California Department of Corrections (CDC) personnel at Calipatria. At that meeting Plaintiff also discussed the search of his cell and confiscation of his writing materials. (Id. at 29–30.) On April 22, 2002, Plaintiff was summoned to Defendant Price's office where Price stated that Garcia had told Price about the meeting with Senator Burton, and Price asked Plaintiff questions about Defendant Richards' conduct. (Id. at 29.)

On April 26, 2002, Defendant Price notified Plaintiff that he had looked into Defendant Richards' reasons for confiscating Plaintiff's property and learned that the reason for confiscation was because Plaintiff had "too many." (Id.) Defendant Price warned Plaintiff that disrespect for the Warden, like complaining to Senator Burton, would not be tolerated. (Id.) Defen-

dant Price caused Plaintiff to be transferred to Facility C on May 1, 2002, and Plaintiff was assaulted and his personal property stolen three days later on May 4, 2002. (Id. at 30). Plaintiff claims Defendants' actions denied him his First Amendment right to free speech (count 7).

## STANDARD OF REVIEW

### Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the granting of a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for the granting of a directed verdict. Judgment must be entered, "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[i]f reasonable minds could differ," judgment should not be entered in favor of the moving party. *Id.*

The parties bear the same substantive burden of proof as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to his case. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505; *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence, which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct.

1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To successfully rebut a properly supported motion for summary judgment, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[ ]'s favor, could convince a reasonable jury to find for the plaintiff[ ]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir.2000)(citing Fed.R.Civ.P. 56; *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir.1988), *Nilsson v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir.1988), the court may nevertheless exercise its discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the moving papers with adequate refer-

ences so that it could be conveniently found." *Id.*

In ruling on a motion for summary judgment, the court need not accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." *Vigliotto v. Terry*, 873 F.2d 1201, 1203 (9th Cir.1989).

### Qualified Immunity

 Defendants assert the affirmative defense of qualified immunity. Qualified immunity entitles government officials to "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). Generally, qualified immunity doctrine must " 'give [ ] ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

Analysis of qualified immunity begins with the two-step sequence of analysis set forth by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Initially, a court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants'

conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151 (instructing federal courts not to assume the existence of a constitutional right even if it is clear that the defendants would be entitled to qualified immunity). If the answer to that question is no, then the case must be dismissed as there is no valid cause of action. *Vance v. Barrett,* 345 F.3d 1083, 1088 (9th Cir.2003). On the other hand, if a violation could be made out, the next step is to ask whether the constitutional right was clearly established and, if so, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Saucier* 533 U.S. at 202, 121 S.Ct. 2151; *Robinson v. Solano County,* 278 F.3d 1007, 1013 (9th Cir.2002) (*en banc*) (explaining that "we must ask first whether the facts taken in the light most favorable to the plaintiff would establish a [constitutional] violation.... Only if the answer is in the affirmative should we address the immunity issue."); *Valdez v. Rosenbaum,* 302 F.3d 1039, 1049 (9th Cir.2002) (having concluded there was no constitutional violation the court need not reach the issue of qualified immunity).

## DISCUSSION

Defendants contend they are entitled to summary judgment because there are no genuine issues of material fact in dispute which, if proven, would support a claim for denial of Plaintiff's Eighth Amendment rights. (Defendants' Memorandum of Points and Authorities in Support of Summary Judgment "Defs' MSJ Mem." at 4).

### A. *Eighth Amendment—Outdoor Exercise*

Defendants contend there are no genuine issues of material fact in dispute which, if proven, would demonstrate that they acted with the requisite subjective intent to violate Plaintiff's Eighth Amendment rights because the denial of outdoor exer-

cise was necessary in light of the events at the prison during the relevant time period. Plaintiff considers a period of nearly four months without outdoor exercise a violation of his Eighth Amendment rights as *a matter of law.*

■ "Whatever rights one may lose at the prison gates,... the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes." *Spain v. Procunier,* 600 F.2d 189, 193–94 (9th Cir.1979) (citation omitted). The Eighth Amendment, however, is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity one might find desirable. *Rhodes v. Chapman,* 452 U.S. 337, 347, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982). Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia,* 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see also Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *see also Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose lock downs to control institutional disturbances, the conditions imposed during the lock down may constitute cruel and

unusual punishment under the Eighth Amendment. *See Hayward v. Procunier,* 629 F.2d 599, 603 (9th Cir.1980) (denial of outdoor exercise may give rise to Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective); *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir.1994).

■ "Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit,* 682 F.2d at 1246; *Farmer,* 511 U.S. at 833, 114 S.Ct. 1970; *Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir. 1981).

■ The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." *Allen,* 48 F.3d at 1087. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970.

### Objective requirement

Plaintiff alleges that the conditions imposed by Defendants constituted cruel and unusual punishment because he was denied outdoor exercise for five months. (Pl.'s TAC at 6.) The Ninth Circuit has stated that "regular outdoor exercise is

extremely important to the psychological and physical well being of the inmates." *Spain,* 600 F.2d at 199 (holding that prisoners in long-term and continuous segregation must be provided regular outdoor exercise unless "inclement weather, unusual circumstances, or disciplinary needs" make it impossible). The court in *Hayward* recognized that when a lock down is instituted in response to a genuine emergency, the decisions regarding when and how to provide for outdoor exercise "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward,* 629 F.2d at 603.

Here, the initial loss of outdoor exercise arose from a race riot between approximately twenty Caucasian and African–American inmates on December 2, 2001, in Calipatria's Facility B. (Defs.'s MSJ Mem. at 4.) As a result of the riot, Warden Garcia implemented modified programming for Facility B which took effect the next day, and which provided for in-cell feeding, controlled showers, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement of Hispanic and Other[2] critical inmate workers. (Declaration of Silvia Garcia, Ex. B to Defs.' MSJ Mem. at ¶ 5.) The restrictions were in the process of being lifted when, on December 27, 2001, a Caucasian inmate killed an African–American inmate and the entire facility was placed on lock down. (Garcia Decl. ¶¶ 6–7.) The lock down ended on January 8, 2002, and by February 5, 2002, all inmates at Calipatria, except the Caucasian and African–American inmates on Facility B, had returned to normal programming. (Id.¶ 10.)

■ exercise is 'one of the basic human necessities protected by the

2. The Other category refers to inmates not belonging to the African–American, Hispanic or Caucasian groups. (Garcis Decl. ¶ 4.)

Eighth Amendment'... a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (twenty-two days insufficient to establish Eighth Amendment violation), quoting *LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993). Here, although Plaintiff was denied outdoor exercise for approximately 150 days, Defendants claim that Plaintiff (1) was not confined to his cell during the periods of modified programming and lock downs, that Plaintiff's cell was large enough to perform various exercises, including push-ups, sit-ups, bicep curls, leg squats, running in place, and stretching, (2) was permitted to shower every two to three days and (3) was permitted to leave the cell for telephone calls (Garcia Decl. ¶ 38.)

The Court finds sufficient evidence in the record to create genuine issues of fact as to whether the denial and/or limitations on Plaintiff's outdoor exercise from December 2001 to May 2002 meet the objective standards required to support an Eighth Amendment violation. See e.g. *Lopez v. Smith,* 203 F.3d 1122, 1133 (9th Cir.2000) (*en banc*) (finding six and one-half weeks deprivations of "all access to outdoor exercise" sufficient to satisfy Eighth Amendment's objective requirements); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996), as amended 135 F.3d 1318 (finding triable issues of facts existed as to whether a six month deprivation of *outdoor* exercise due to Plaintiff's placement in the Intensive Management Unit violated the Eighth Amendment). However, despite the fact there are genuine issues of fact regarding the objective prong, and even assuming the objective prong was satisfied as a matter of law, summary judgment is still appropriate if there are not genuine issues of material fact in dispute regarding whether the subjective prong has been satisfied. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.

**Subjective Requirement**

In order to avoid summary judgment, Plaintiff must also show triable issues as to the Eighth Amendment's subjective requirement. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. The Court finds no evidence in the record to support Plaintiff's claim that the period without outdoor exercise, which began as a result of racial tension and violence and culminated in an inmate's murder in Calipatria's B facility, was the result of Defendants' "deliberate indifference" or was motivated by "malicious" and "sadistic" intent to harm or punish him. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970, *Lopez,* 203 F.3d at 1133.

The evidence before the Court shows that the suspension of outdoor exercise began only *after* racial tensions in Calipatria's B Facility erupted into violence on December 2, 2001, between Caucasian and African–American inmates housed in Unit B3. (Garcia Decl. ¶ 5.) One inmate sustained serious injury and one weapon was recovered. (*Id.*) Defendant Garcia instituted modified programming for Facility B beginning the day after the race riot. (Garcia Decl. ¶ 6.) The modified programming included in-cell feeding, controlled showers, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement of Hispanic and Other critical inmate workers. (Id.) Garcia indicates she instituted the modified programming in order "to maintain and ensure the safety and security of inmates and correctional staff while the cause of the riot was investigated, and the facilities and common areas were searched for weapons." (Id.) The searches were completed by December 11, 2001, and although modified programming continued for African–American and Caucasian inmates, normal programming was restored for all other inmates. (Id.)

Beginning on December 18, 2001, African–American and Caucasian inmates began a gradual return to normal programming by being allowed to shower without handcuffs. Regular contact visits were resumed on December 26, 2001. On December 27, 2001, African–American and Caucasian critical workers were authorized to leave their housing units. (Garcia Decl. ¶ 10.) On December 27, 2001, a Caucasian inmate killed an African–American inmate at Calipatria and two inmate-manufactured weapons were found. (Id.) Although Garcia was away on vacation from December 22, 2001, through January 6, 2002, the Acting Chief Deputy Warden, with the permission of the Regional Administrator of the CDC, declared a state of emergency and imposed an institutional lock down based on the homicide as well as other incidents of inmate-on-inmate violence in other facilities. (Id.¶ 10.) The institutional lock down began on December 27, 2001, and ended on January 8, 2002. A modified program was instituted because of continuing intelligence that racial violence was likely to result if African–American and Caucasian inmates in Facility B were returned to normal programming. (Id.¶ 13.)

Garcia states that she continued to restore privileges to African–American and Caucasian inmates on Facility B throughout February and March as follows:

- February 23, 2002, these inmates were authorized to receive packages;
- February 26, 2002, in-cell religious programming was authorized;
- March 13, 2002, in-cell canteen list was modified to include additional items;
- March 19, 2002, contact visits resumed and law library access was expanded to include all inmates;
- March 27, 2002, inmates were authorized to make phone calls during their shower time and the handcuff requirement for shower escorts was eliminated. (Id.¶ 14.)

Unfortunately, on April 7, 2002, a battery on an inmate with a weapon occurred in Unit B5 in Facility B between two Caucasian inmates, which resulted in serious injury. (Garcia Decl ¶ 15.) A work stoppage occurred on April 8, 2002, and based on these two incidents Facility B was ordered to remain on modified programming until additional searches were completed. (Garcia Decl. ¶ 15.) On April 20, 2002, a mutual combat incident occurred in Facility B Unit B3, involving two Caucasian and five African–American inmates (Garcia Decl. ¶ 16.) Thereafter, Plaintiff was transferred to Facility C on or about May 1, 2002.

The record is replete with facts which reveal that restrictions on outdoor exercise were instituted for the primary purpose of preventing further race-based attacks, injuries and homicides. In addition to Warden Garcia's claims, all the documentary evidence related to the lock down shows that the conditions and restrictions imposed were designed, implemented and continually modified in an effort to "stop [the] racially-motivated violence, secure the safety of all inmates and prison staff, protect institutional property, facilitate an investigation into the racially motivated riots and their causes, determine the likelihood and nature of further violence, and discover and confiscate inmate manufactured weapons and contraband." (Garcia Decl. ¶ 39.)

Plaintiff does not come forward with evidence to refute Defendant Garcia's explanations as to the circumstances and motivations underlying Defendant Garcia's decisions.

As set forth above, determinations such as how long denial of outdoor exercise is necessary "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward*, 629 F.2d. at 602. Defendants have demonstrated that the

yard restriction was imposed as a result of race riots, that each time restrictions were relaxed further serious racial violence erupted, that trial yard releases resulted in immediate racial violence, and that the yard releases were successfully restored only after a period of investigation, mediation and eventual transfer of certain inmates from Facility B.

Defendants assert that racial unrest cannot be resolved unless warring factions resolve their racial differences, and that such process is facilitated by allowing inmates to restore order within their own power structures. (Garcia Decl. ¶ 44.) Defendants contend this process is accomplished by following proven procedures such as were taken here, which provided an opportunity for the warring factions to communicate with each other while limiting their opportunities for counterproductive activities. (Id.) Defendants state that segregated yard releases were not an option because they are against CDC policy, and, it is the understanding of both Defendants that segregated yard releases have been ruled to be unconstitutional. (Garcia Decl. ¶ 45.) Plaintiff has not come forward with any evidence to counter the Defendants' overwhelming evidence that the period of suspension of outdoor exercise was a necessary reaction to the racial unrest at the prison. Further, Plaintiff has not produced evidence to demonstrate that Defendants' actions were done with deliberate indifference to Plaintiff's health and safety.

Therefore, this Court finds no genuine issues of material fact exist to show that Defendants deprived Plaintiff of outdoor exercise with the "deliberate indifference" to his health or safety necessary to support an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835, 114 S.Ct. 1970. Rather, the uncontroverted evidence establishes that the suspension of outdoor exercise was a reasonable and necessary response to ongoing racial violence at California.

patria. Plaintiff has failed to present any evidence to support a finding that the initial suspension or delay in restoration of outdoor exercise amounted to a violation of his Eighth Amendment rights. Accordingly, it is recommended that Defendants' motion for summary judgment on this ground be **GRANTED**.

**Qualified Immunity**

Because the Court has found no violation of Plaintiffs's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); see also *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

**B. Eighth Amendment–Failure to Protect**

Plaintiff claims that Defendants were aware that a prison gang was enforcing, through threat of retaliation, an edict that all Caucasian inmates must assault any Black inmate any time an opportunity was presented. (TAC at 14.) Plaintiff alleges that, despite this knowledge, Defendants allowed to be circulated among the Facility B population a Program Status Report dated April 30, 2002, which stated that Plaintiff and a Black inmate named Armstrong "are to remain in the same building at the same time." (Id. at 15.) Plaintiff contends that Defendants were aware that other inmates in Facility B were aware that Plaintiff had the opportunity to assault a Black inmate, and that the Defen-

dants were aware that Plaintiff would be targeted by the gang if he failed to attack a Black inmate when he had the chance. (Id. at 15.)

Plaintiff alleges that several inmates in Facility B who were targeted for reprisal from the gang informed Defendants that the gang's reach extended to Facility C and that a transfer to Facility C would not secure their safety. As a result, these inmates were placed in protective custody. (Id. at 16.)

In support of their motion for summary judgment Defendants argue that they lacked the requisite knowledge Plaintiff would be attacked upon transfer to Facility C because they relied on Plaintiff's "affirmative representations" (Defs' MSJ Mem. at 6) that Plaintiff had no known enemies on yard C. As evidentiary support for their claim Defendants refer to Plaintiff's Exhibit X of the TAC (also presented in Plaintiff's Opposition as Exhibit G). Plaintiff's Exhibit X is a short memorandum signed by Defendant Price. The memorandum briefly states that Plaintiff's "Central File" was reviewed and it appears that Plaintiff has no enemies on Facility C. The form memorializes Plaintiff's transfer from Facility B to Facility C on May 1, 2002. (Pl.'s Opp. Exhibit G.)

In order to demonstrate an Eighth Amendment violation, an inmate must *first* show that the deprivation or injury suffered was "objectively, sufficiently serious" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted), and *second* that the prison officials acted with a "sufficiently culpable state of mind." *Id.* "[A] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828, 114 S.Ct. 1970. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of

and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *Estate of Ford v. Ramirez–Palmer,* 301 F.3d 1043, 1049–50 (9th Cir.2002).

■ "A plaintiff may make the factual showing that a prison official had the requisite knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence.'" *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. "Thus a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 843 n. 8, 114 S.Ct. 1970. Moreover, "[t]urning a blind eye to the relevant surrounding facts will not shield a prison official from liability." *Swan v. United States of America,* 159 F.Supp.2d 1174, 1182 (N.D.Cal.2001). "'If the evidence shows that a [prison official] merely refused to verify underlying facts that he strongly suspected to be true or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation...),' liability may be imposed." *Id.* at 1182, citing *Farmer,* 511 U.S. at 843 n. 8, 114 S.Ct. 1970.

In response to Defendants' motion for summary judgment, Plaintiff submits, *inter alia,* the declaration of inmate Daniel Dunaway, which recounts inmate Dunaway's experience as a result of the racial fighting in Facility B beginning in December 2001. Specifically, inmate Dunaway states:

> **Because I had the opportunity to, but did not, participate in the Caucasian–Black incident on the yard I**

knew that I would be targeted for violent assault. I know that I could not continue to reside on any general population yard at Calipatria State Prison once I had become marked for violent assault. I approached prison authorities and informed them of my safety concerns motivated by the circumstances of the homicide on December 27, 2001. As a result of my expressed safety concerns I was placed in administrative segregation. During the course of repeated discussions with prison authorities I informed them that I would not be safe on any of the general population yards at Calipatria State Prison.

However, there is no evidence in the record presented that Plaintiff ever approached Defendants and asked to be placed in protective custody because he feared retaliatory assault. Indeed, a review of Plaintiff's Exhibit E (various Program Status Reports) shows that on numerous occasions Plaintiff enjoyed freedom of movement within his building in his capacity as a MAC representative. (Pl.'s SAC Exhibits E15, E16, E19, and E21.) According to the Program Status Reports submitted by Plaintiff, at other times, he also had building to building access. (Pl.'s SAC Exhibits E22, E23, E26, and E27.) Notably, there is no evidence in the record that Plaintiff ever affirmatively declined these special access opportunities or notified prison officials that he would not be availing himself of this special access because he was in fear of being assaulted in Facility A, B or C.

Plaintiff's TAC is full of conclusory statements about what Defendants "knew" with respect to the threat of potential retaliatory assault by "Caucasian gang members." However, to avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations. *Berg v. Kincheloe,*

794 F.2d 457, 459 (9th Cir.1986). Rather, he must present specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Plaintiff has not sufficiently demonstrated that Defendants were deliberately indifferent to a substantial risk that Plaintiff would be seriously harmed if transferred to Facility C. At the time the decision to transfer was made, Defendants possessed the following information: 1) Plaintiff never directly expressed to Defendants that he harbored serious concerns for his personal safety; 2) Plaintiff continued in his position as MAC representative which included the freedom of movement within the building and building to building during the lock down, including access to Facility C; and 3) Plaintiff's "Central File" showed Plaintiff had no known enemies in Facility C. (Pl.'s Opp. Exhibit G.)

Thus, based upon Defendants' knowledge at the time and taken in the light most favorable to the Plaintiff, Defendants' decision to transfer Plaintiff to Facility C did not pose such a substantial risk of serious harm as to be constitutionally impermissible. The evidence does not show that Plaintiff faced an intolerably high risk of serious injury, "nor does it show that a reasonable correctional officer would have believed otherwise." *Estate of Ford v. Ramirez–Palmer,* 301 F.3d 1043, 1052–53 (9th Cir.2002). Accordingly, it is recommended that Defendants' motion for summary judgment based upon this claim be **GRANTED.**

## Qualified Immunity

Because the Court has found no triable issue regarding the alleged violations of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118

S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); *see also Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### C. Eighth Amendment–Retaliation

Plaintiff argues in Count Seven of his Third Amended Complaint that the search of his cell and the transfer which resulted in his assault on May 4, 2002 were done in retaliation for his free speech activities and as such violated his First Amendment rights. (TAC at 27.) As a result of the transfer and assault, Plaintiff contends he no longer exercises his free speech activities for fear of further retaliation.[3]

Defendants briefly argue that they are entitled to summary judgment on this claim because Plaintiff continues to pursue free speech activities. (Defs'MSJ Mem. at 7.) Defendants' contend there is no chilling effect on Plaintiff's protected speech activities and Plaintiff has no evidence to create a genuine issue of fact on this claim. (Id.)

 The Constitution provides protections against "deliberate retaliation" by prison officials against an inmate's exercise of his right to petition for redress of grievances. *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310,1314 (9th Cir.1989). Because retaliation by prison officials may chill an inmate's exercise of his legitimate First Amendment rights, such conduct is actionable even if it would not otherwise rise to the level of a constitutional violation. *Thomas v. Carpenter,* 881 F.2d 828,

830 (9th Cir.1989). The Ninth Circuit has held that the right of meaningful access to the courts extends to established prison grievance procedures. *See Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989); see also *Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir.1997). A prisoner's right of meaningful access to the courts, along with his broader right to petition the government for the redress of grievances under the First Amendment, preclude prison authorities from penalizing a prisoner for exercising those rights. *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir.1995), *Soranno's Gasco,* 874 F.2d at 1314 (the "government" to which the First Amendment guarantees a right to redress of grievances includes prison authorities.)

 An alleged retaliation against a prisoner's First Amendment right to file a prison grievance is enough to support a section 1983 claim. *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir.2003). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson,* 408 F.3d 559, 567 (9th Cir.2004).

Plaintiff claims that Defendants Price and Richards retaliated against him for: 1) his free speech activities within the prison which were taken in his capacity as Chairman of the MAC; 2) the grievances he filed with regard to the lock down conditions; and 3) his personal litigation activities. For example, on December 18, 2001, Plaintiff filed a Form 602 Inmate Appeal

---

**3.** Other than in Plaintiff's unverified complaint the Court finds no evidence of a cell scarch "on or about April 11, 2002." There-

fore, the Court will focus on Plaintiff's transfer from Facility B to Facility C as the basis for Plaintiff's claim of unlawful retaliation.

("602") regarding the lock down that occurred on December 2, 2001. (Pl's Second Amended Complaint ("SAC") Exhibit A.) Similarly, on February 20, 2002, Plaintiff filed a "602" regarding lack of outdoor exercise, lack of law library access, among other things. (Pl's SAC, Exhibit A.) In a letter dated March 6, 2002, Plaintiff sent a letter to Warden Garcia stating: "[d]ue to impediments you have imposed to my access to the inmate law library, I am resorting to this letter to inform you that I will be seeking a restraining order from the United States District Court for the Southern District of California." (Pl's SAC, Ex. F.) On March 16, 2006, Plaintiff met with Defendant Anti to discuss the letter Plaintiff sent to Defendant Garcia complaining of the lock down. That meeting was memorialized in a follow-up letter Defendant Garcia sent to Plaintiff about Plaintiff's conversation with Defendant Anti. (Pl's SAC, Exhibit G.)

Additionally, in April 2002, it is undisputed that Defendants were aware Plaintiff met with a California Senate staff member, Anthony Williams. According to Plaintiff he complained to Mr. Williams about the "climate of lawlessness among CDC personnel at CSP and the code of silence that enabled it to flourish." (Pl.'s TAC at 29.) Lastly, on May 14, 2002, Plaintiff filed a "602" alleging retaliation by prison personnel for "speaking out against the cruel and unusual conditions of confinement." (Pl.'s SAC, Exhibit A, p. 4.)

Plaintiff claims he now fears filing new 602 grievances after his transfer to Facility C and subsequent assault on May 4, 2002, In support of Plaintiff's on-going fear of additional retaliation, he submits a declaration prepared by Inmate Jamal Walker. Inmate Walker states that after Plaintiff's assault Plaintiff declined to file 602 grievances. According to Inmate Walker, he asked Plaintiff if he was afraid to file inmate grievances and that Plaintiff stated

" 'yes, you would be too if they did to you what they did to me.' " (Pl's SAC Exhibit W.)

▮▮▮ "Intent to inhibit speech, which 'is an element of the claim' can be demonstrated through direct or circumstantial evidence." *Mendocino Environmental Center v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999). "Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in protected activity,"(*Id.* at 1300) a plaintiff "does not have to demonstrate that his speech was actually inhibited or suppressed." *Rhodes v. Robinson,* 408 F.3d 559, 569 (9th Cir. 2005). "Circumstantial evidence of intent is sufficient to survive summary judgment motion." *Magana v. Commonwealth of N. Mariana Islands,* 107 F.3d 1436, 1448 (9th Cir.1997).

▮▮ Even circumstantially, Plaintiff has failed to establish all of the elements necessary to support a First Amendment retaliation claim. As the evidence presented shows, Defendants were attempting to protect Plaintiff from inmate assault by transferring him to Facility C. All the information in Defendants' possession pointed to a heightened risk for Plaintiff's safety in Facility B, *not* Facility C. For example, information contained in Plaintiff's "Central File" indicated that Plaintiff had no known enemies in Facility C. (Pl.'s Opp. Exhibit G.) Moreover, Plaintiff has not demonstrated that remaining in Facility B would have been safer than being transferred to Facility C.

Furthermore, even though Plaintiff filed numerous grievances and complaints, Plaintiff fails to present a connection between the grievances he filed and the alleged retaliatory transfer. There is no evidence that Plaintiff's transfer was not motivated by a legitimate correctional

goal. "The Court must 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland* 65 F.3d 802, 807 (9th Cir.1995). "The burden is on plaintiff to demonstrate 'that there were no legitimate correctional purposes motivating the actions he complains of.'" *Id.* at 808.

Here, Plaintiff fails to contradict the evidence in the record that Plaintiff was transferred to Facility C to protect him from inmate assault. Presented in an internal prison memorandum is information received from an unidentified inmate who voluntarily disclosed to Defendant Price that he was ordered to assault Plaintiff "as soon as the Facility B Matrix was upgraded." (Pl.'s Opp. Exhibit G.) This confidential inmate/witness also reported that "Facility B is a war zone between the Caucasian and Black inmates." (Id.)

The Court notes that the memorandum is dated May 7, 2002, three days *after* Plaintiff's assault in Facility C. However, contained in the memorandum is a notation by Defendant Price that Plaintiff had been previously moved from Facility B to Facility C due to housing concerns. (Id.) Also, contained in the memorandum is a notation stating that after Plaintiff was assaulted on May 1, 2002, he was placed in administrative segregation until a review of his housing needs could be completed. (Id.)

Additionally, Plaintiff fails to contradict the "General Chrono" dated May 1, 2002, which provides information related to Plaintiff's transfer. (Pl.'s Opp. Exhibit E.) Specifically, the "Chrono" states that Plaintiff's transfer is not adverse in nature and that Plaintiff's "Central File" had been reviewed. As a result, prison administration determined that Plaintiff had "no known enemies on Facility C." (Pl.'s Opp. Exhibit E.)

Taken together these exhibits present strong circumstantial evidence that Plaintiff's transfer was motivated by a legitimate correctional purpose. Plaintiff offers no rebuttal to these exhibits despite having included them in his TAC and in his Opposition to Summary Judgment. Therefore, the Court finds that Plaintiff has not met his burden. Plaintiff's failure to meet his burden is fatal to his claim of retaliation. Without evidence of all five elements, Plaintiff cannot succeed in establishing "a viable claim of First Amendment retaliation." *Rhodes v. Robinson,* 408 F.3d 559, 567 (9th Cir.2004). Accordingly, it is recommended that Defendants' motion for summary judgment on this claim be **GRANTED**.

## Qualified Immunity

Because the Court has found no violation of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); see also *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## D. Fourteenth Amendment–Due Process

In Count Two, Plaintiff alleges he was consistently deprived of canteen access, religious services, law library access and outdoor exercise. (Pl.'s TAC at 7.) Although Defendants fail to specifically address this issue, they state generally that all of Plain-

tiff's claims fail under the Fourteenth Amendment. (Defs.' MSJ Mem. at 7.)

 "The Due Process Clause of the Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Thompson v. Souza,* 111 F.3d 694, 701(9th Cir.1997). "The Fourteenth Amendment prohibits prison officials from treating prisoners in a fashion so 'brutal' and 'offensive to human dignity' as to 'shock the conscience.'" *Id.* at 701 (internal citations omitted).

"To state a claim under section 1983 based on a Fourteenth Amendment due process violation, [Plaintiff] must allege a liberty deprivation and a lack of due process." *McRorie v. Shimoda,* 795 F.2d 780, 785 (9th Cir.1986).

### a. canteen items

 Plaintiff has alleged that Defendants denied unrestricted canteen access. "However, there is no constitutional right to such items." *Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir.1996).

### b. religious services

 Plaintiff alleges that he was denied "reasonable time for religious services." (Pl.'s TAC at 9.) Plaintiff presents a brief statement regarding lack of religious services in his unverified TAC. Plaintiff makes no claim that he personally avails himself of religious guidance. Therefore, Plaintiff has failed to identify an "injury in fact to himself" and thus lacks standing to challenge it. *Id.* at 1093, citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Furthermore, contrary to Plaintiff's allegations, noted in every Program Status Report submitted by Plaintiff is an authorization for "in cell" religious programming during the lock down. (Pl.'s Opp at Exhibit I.)

### c. law library access

 briefly asserts that "state law and consistent application of this law .... entitle Plaintiff to access to (sic) the inmate law library." (Pl.'s TAC at 9.) Plaintiff fails to allege any injury he suffered as a result of Defendants' regulation of law library access during the lock down period. Indeed, Plaintiff's claim is completely contradicted by a review of the Program Status Reports. Those reports show that law library access, based upon lock down status, was alternatively authorized for those inmates with "verified court deadlines" or for all inmates under normal programming guidelines. (Pl.'s Opp. Exhibit I.)

### d. outdoor exercise

Previously discussed at length, Plaintiff's claim alleging a constitutional deprivation of outdoor exercise fails as a matter of law. Plaintiff's temporary lack of outdoor exercise within the context of the institutional lock down in place at the time did not constitute "deliberate indifference" by Defendants. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Based upon the applicable law and facts, Plaintiff has failed to allege any Due Process violation. Thus, it is recommended that Defendants' motion for summary judgment on these claims be **GRANTED**.

### Qualified Immunity

Because the Court has found no violation of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); see

also *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### E. 14th Amendment–Equal Protection

Plaintiff alleges that the lock down and other restrictive procedures implemented by Defendant Garcia directed toward the Caucasian and Black inmates on December 2, 2001 in response to on-going interracial fights in Facility B was a violation of Plaintiff's Fourteenth Amendment equal protection rights. Plaintiff, who is Caucasian, claims he was subject to disparate treatment based upon his ethnic group. (Pl's TAC at 11.)

Defendants' move for summary judgment on the ground that "by alleging that he is a Caucasian inmate, Plaintiff fails to bring himself into membership of a protected class, or to show that Defendants acted with invidious intent to discriminate against him based on his membership in a protected class." (Defs' MSJ Mem. at 7.)

The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

In the prison context, a prisoner must demonstrate that his treatment is invidiously dissimilar to that received by other inmates. A prison classification based on race is at once suspect and is subject to strict scrutiny. Therefore, prison officials must demonstrate that any policy based on race is narrowly tailored to meet a compelling government interest. *See Johnson v. California*, 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005).

The policy challenged by Plaintiff is the lock down of African–American and Caucasian inmates beginning on December 2, 2001 in Facility B. A review of the events as they transpired demonstrates that any race based policy implemented by Defendants was narrowly tailored to meet the institution's goal of returning to normal programming for all inmates.

- December 2, 2001: twenty African–American and Caucasian inmates caused a racial riot in Facility B–3. In response, the facility was placed on a modified program.

- December 11, 2001: normal programming is resumed for Hispanic and Other inmates. Modified programming is continued for African–American and Caucasian inmates.

- December 18, 22, and 26, 2001: Steps are taken toward returning African–American and Caucasian inmates to normal programming.

- December 27, 2001: an African–American inmate is killed by a Caucasian inmate in Facility B. Additional inmate-on-inmate violence is breaking out in other housing facilities. As a result, the entire inmate population is placed on lock down status and a state of emergency is declared.

- January 8, 2002: housing facilities A, C, and D are placed on a modified yard schedule. Facility B remains locked down.

- January 15, 2002: some privileges are restored to African–American and Caucasian inmates in Facility B.
- February 5, 2002: all inmates in Facility B except for African–American and Caucasian inmates return to normal programming.
- February 23, 2002 through March 27, 2002: African–American and Caucasian inmates are gradually returned to normal programming.

 The above examples presented by Defendants amply demonstrate that the race-based security measures complained of by Plaintiff were narrowly tailored and were implemented to resolve the compelling government interest of restoring prison security and discipline. *See Johnson v. California,* 125 S.Ct. at 1150, citing *Lee v. Washington,* 88 S.Ct. 994

Plaintiff has failed to raise a triable issue of fact that he was subjected to race discrimination. All inmates were on lock down status initially. Gradually all inmates housed in Facility A, C, and D were returned to normal programming. African–American and Caucasian inmates in Facility B were continued on lock down status to protect them from further interracial assaults. As noted herein, Defendants' continuing goal was to return all inmates in every facility to normal programming. Plaintiff provides no persuasive evidence that Defendants' actions were not narrowly tailored and taken absent the compelling government interest of restoring prison security and discipline. Therefore, Plaintiff has not met his burden of demonstrating the existence of a material factual dispute. Accordingly, Defendants are entitled to judgment as a matter of law on this claim and it is recommended that Defendants' motion for summary judgment on this ground be **GRANTED.**

**Qualified Immunity**

Because the Court has found no violation of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); see also *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### F. Declaratory Relief

In Counts Eight and Nine of the Third Amended Complaint, Plaintiff requests declaratory relief. Count Eight requests "that the Court declare that the Defendant's policy and practice—of denying him, and other inmates outdoor exercise over an extended period of time, subsequent to incidents of violence, solely on the basis that they share the same race as some, but not all, of the perpetrators of these incidents—is a violation of Plaintiff's right to be free of cruel and unusual punishment." (Pl.'s TAC at 34.) Count Nine requests "that the Court declare that the Defendant's policy and practice—of denying him, and other inmates entitlements and privileges over an extended period of time, subsequent to incidents of violence, solely on the basis that they share the same race as some, but not all, of the perpetrators of these incidents—is a violation of Plaintiff's right to equal protection of and equal privileges under the laws of the United States." (Pl.'s TAC at 36.)

 Plaintiff's request for declaratory relief would only be appropriate if it would "serve a useful purpose in clarifying and settling the legal relations in issue," *and* if it would "terminate and afford relief from

the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir.1984). Plaintiff's request for a declaratory judgment that the lock down and denial of amenities violated his constitutional rights (see Pl.s' TAC 34–36) simply does not meet these criteria because it would merely require findings of fact and law identical to those necessary to support a damages claim. As such, a declaratory judgment would serve "no useful purpose" in this case. *Id.*

Therefore, it is recommended that Defendants' motion for summary judgment on Plaintiff's claims for declaratory relief be **GRANTED.**

### G. Injunctive Relief

In his third amended complaint, Plaintiff seeks an order enjoining "Defendant Garcia from preventing Plaintiff from enjoying outdoor exercise on a long-term basis in the future." (Pl's TAC at 39.) Defendants move for summary judgment on Plaintiff's claim for relief on the ground that, because "Plaintiff cannot prove any ongoing violation of his constitutional rights, he is not entitled to either form of equitable relief.." (Defs.' MSJ Mem. at 14.)

■ Injunctive relief is available to a litigant only upon a showing that there is a "real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). "The Supreme Court has repeatedly cautioned that absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way." *Hodgers–Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir.1999), *see also Midgett v. Tri-County Metro. Transp. Dist.* 254 F.3d at 850 (9th Cir.2001) (plaintiff must show an immediate threat of substantial injury in order to obtain injunctive relief.). Plaintiff has not provided any persuasive evidence that demonstrates he will suffer an immediate and irreparable injury if injunctive relief is denied. Therefore, it is recommended that Defendants' motion for summary judgment on Plaintiff's claim for injunctive relief be **GRANTED.**

### H. Attorney Fees

■ Defendants also move to strike Plaintiff's request for attorney fees. In his *pro se* complaint Plaintiff seeks, among other relief, "reasonable attorneys' fee...." (Pl.s' TAC at 41.) The case law is clear, however, that *pro se* litigants are not entitled to an award of attorneys fees. *See Kay v. Ehrler*, 499 U.S. 432, 436–37, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991); *see also Corrigan v. United States*, 27 F.3d 436, 438–39 (9th Cir.1994) (purpose of statute permitting award of fees is to enable litigant to obtain assistance of counsel); *Manos v. U.S. Dept. of the Air Force*, 829 F.Supp. 1191, 1193–94 (N.D.Cal.1993) (*pro se* litigant not entitled to attorneys fees because such fees were not actually incurred). Accordingly, the Court recommends that the request for attorneys fees be **STRICKEN.**

### I. Judicial Notice

The parties both request that the Court take judicial notice of various documents they have submitted in support of their filings.

■ Judicial Notice is governed by Federal Rule of Evidence 201 which only concerns judicial notice of adjudicative facts. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court

or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *FRE 201.* "[A] party requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice." *In re Tyrone F. Conner Corporation,* 140 B.R. 771, 781 (1992). "To sustain its burden in persuading the trial judge that the adjudicative fact sought to be noticed is in fact proper for notice under Federal Rule of Evidence 201, the party must (1) persuade the court that the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source 'whose accuracy cannot reasonably be questioned'...." *Id.* at 781. In other words, "the fact must be one that only an unreasonable person would insist on disputing." *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994). Documents that are part of the public record may be judicially noticed to show, for example, that a judicial proceeding occurred or that a document was filed in another court case, but a court may not take judicial notice of findings of facts from another case. *See Wyatt v. Terhune,* 315 F.3d 1108, 1114 & n. 5 (9th Cir.2003); *Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir.2001); *Jones,* 29 F.3d at 1553. Nor may the court take judicial notice of any matter that is in dispute. *Lee,* 250 F.3d at 689–90; *Lozano v. Ashcroft,* 258 F.3d 1160, 1165 (10th Cir.2001).

Defendants ask the Court to take judicial notice of "the complete file and records in this action, and of the existence of the actions also on file in this Court entitled *Jones v. Garcia,* 430 F.Supp.2d 1095, and *Walker & Hurd v. Woodford,* 2006 WL 2818832; of Exhibits A through C, and their contents, to the Declaration of G. Michael German filed herewith; and of such additional matters subject to judicial notice as Defendants may provide to the Court by the time this matter is submitted for decision." (Defendants' Request for Judicial Notice.)

The Court may take judicial notice of another court's opinion, but "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Lee v. City of Los Angeles,* 250 F.3d 668, 690 (9th Cir.2001) *citing Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426–27 (3rd Cir.1999).

Plaintiff asks the Court to take judicial notice of numerous documents submitted in support of his opposition to Defendants' motion for summary judgment. These documents consist of documents related to the lock down generated by the prison entitled "Program Status Report"; copies of 602 forms submitted by Plaintiff to prison administration; declarations from other inmates regarding the lock down and potential for inmate assault in Facility B. Plaintiff also submits copies of other courts' opinions. As noted above, the Court may take judicial notice of such opinions but not for the truth of their contents. As to the remaining documents, including the letters, articles, Program Status Reports, 602 forms, etc., the Court is aware of no basis for taking judicial notice of these documents.

For these reasons, the Court **RECOMMENDS** that Plaintiff's request to take judicial notice be **GRANTED** as to Exhibits L, and Q, and **DENIED** as to all other exhibits. With respect Defendants' request for judicial notice, the Court recommends that judicial notice be **GRANTED** as to the three cases cited by Defendants, *Jones v. Garcia,* 430 F.Supp.2d 1095, *Walker & Hurd v. Woodford,* 2006 WL 2818832, *Williams v. Garcia,* 180 Fed. Appx. 693, 2006 WL 1375111, *1 (9th Cir. 2006) and **DENIED** as to all other exhibits. (Defendants Request for Judicial No-

tice; Defendants' Supplemental Request for Judicial Notice).

For clarity of the record, all the remaining exhibits submitted by Plaintiff and Defendants may be properly considered by the Court without having to take judicial notice of them pursuant to FRE 201.

## CONCLUSION

For the reasons set forth herein, it is recommended that Defendants' Motion for Summary Judgment in accordance with Fed.R.Civ.P. 56(c) be **GRANTED**. This report and recommendation will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1988). Any party may file written objections with the court and serve a copy on all parties by *September 18, 2006.* The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed by *October 6, 2006.* The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

**IT IS SO ORDERED.**

Aug. 30, 2006.